UNITED STATES of America, Plaintiff–Appellee,

v.

Ramon VELARDE–GOMEZ, Defendant–Appellant.

No. 99–50602.

United States Court of Appeals, Ninth Circuit.

Rehearing En Banc Granted May 8, 2001

Argued and Submitted En Banc June 20, 2001

Filed Oct. 23, 2001

Joseph J. Burghardt, Esq., Federal Public Defenders of San Diego, San Diego, California, for the defendant-appellant.

Terri L. Goodman, Esq., Federal Public Defenders of San Diego, San Diego, California, for the defendant-appellant.

Shereen J. Charlick, Esq., Federal Public Defenders of San Diego, San Diego, California, for the defendant-appellant.

Patrick K. O'Toole, Esq., United States Attorney, San Diego, California, for the plaintiff-appellee.

Maura Quinn, Esq., Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

Before: SCHROEDER, Chief Judge, HUG, PREGERSON, KOZINSKI, FERNANDEZ, KLEINFELD, SILVERMAN, WARDLAW, W. FLETCHER, GOULD, and PAEZ, Circuit Judges.

WARDLAW, Circuit Judge:

Ramon Velarde–Gomez ("Velarde") appeals his conviction under 21 U.S.C. §§ 952 and 960 for importation of marijuana, and under 21 U.S.C. § 841(a)(1) for possession of marijuana with intent to distribute. The government elicited testimony about Velarde's post-arrest, pre-*Miranda* non-responses to questions during an interview by border agents, characterizing Velarde's non-reaction as "demeanor" evidence. The district court allowed this

testimony over Velarde's objection, agreeing in large measure with the government's characterization and also finding a subsequent waiver of *Miranda* rights to encompass the silence preceding the *Miranda* warnings. Because we discern no meaningful distinction between the "demeanor" evidence at issue here and the "silence" we held inadmissible in *United States v. Whitehead,* 200 F.3d 634 (9th Cir.), *cert. denied,* 531 U.S. 885, 121 S.Ct. 202, 148 L.Ed.2d 141 (2000), and because the admission of that evidence was not harmless, we reverse and remand to the district court for a new trial. We further hold that the district court did not violate the Vienna Convention when it denied Velarde's motion to suppress.

## I. Factual and Procedural History

On January 23, 1999, at approximately 5:20 p.m., Velarde attempted to enter the United States from Mexico at the San Ysidro, California Port of Entry. He was the driver and sole occupant of a silver 1983 Grand Marquis. At the primary inspection site, Velarde told United States Customs Service ("Customs") Agent Rodriguez that he had gone to Tijuana to "do some drinking" and was returning home to Hemet, California. He also told Agent Rodriguez that he had purchased the car twenty days earlier from an individual in Palm Springs, California, and produced title to the automobile, which remained in the former owner's name. Suspicious about the vehicle's ownership, Agent Rodriguez asked Velarde to proceed to the secondary inspection site.

At the secondary inspection site, a drug dog alerted Customs officials to the Grand Marquis's gas tank. Customs officials removed the tank and found that it contained sixty-three pounds of marijuana. The marijuana-filled gas tank could hold less than two gallons of fuel.

At approximately 10:00 p.m., Customs Agents Salazar and Wilmarth escorted Velarde to an interview room, where Agent Salazar informed Velarde that Customs had found the marijuana. Velarde did not speak or physically respond. At some later time (the district court used a time of four and one-half hours, but expressed no view on the accuracy of this fact), Agent Salazar read Velarde his *Miranda* rights. Velarde then waived those rights and subjected himself to questioning.

On March 10, 1999, the United States filed a two-count indictment against Velarde in the Southern District of California. Count one charged Velarde with importation of marijuana, in violation of 21 U.S.C. §§ 952 and 960. Count two charged him with possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

Before trial, Velarde filed a motion in limine seeking, *inter alia,* to exclude evidence of his silence and demeanor and to suppress his post-*Miranda* statements on the ground that he was not informed of his rights under the Vienna Convention. The district court granted the motion to exclude evidence of silence and demeanor, but denied the motion to suppress under the Vienna Convention. On the second day of trial, however, the government asked for clarification of the court's ruling regarding the inadmissability of Velarde's post-arrest non-responsiveness. During a somewhat confused colloquy, the district court reconsidered its previous ruling. It distinguished *Doyle v. Ohio,* 426 U.S. 610, 619–20, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (comment on post-arrest, post-*Miranda* silence inadmissible under the Fifth Amendment) and *Guam v. Veloria,* 136 F.3d 648, 652 (9th Cir.1998) (same), from Velarde's case, because in both *Doyle* and *Veloria* each defendant invoked his right to remain silent after being read their *Miranda*

rights. The district court then permitted the government to introduce all of its evidence of "demeanor" both before and after Velarde waived his *Miranda* rights.

At trial, Agent Salazar testified as to Velarde's non-responsiveness during the interrogation. The prosecution elicited testimony from Agent Salazar about Velarde's interview following the agent's discovery of marijuana in Velarde's car. The transcript makes clear that the interview took place before Velarde was read his *Miranda* rights and his subsequent waiver of his right to remain silent. Over defense objection, Agent Salazar's direct examination proceeded:

Q: Now, when you first started asking the defendant questions, did you tell him what had been found in the vehicle?

A: Yes, I did.

Q: And what did you tell him?

A: I told him that 63 pounds of marijuana had been found in the gas tank of the vehicle he was driving.

Q: And what was his response?

[Defense]: Objection, your honor, based upon the previous thing we talked about.

The Court: Overruled.

A: I told him that. Before we give the Miranda rights, we always mention why they're there.

Q: Okay. And what was his response when you told him there was marijuana found in the vehicle?

A: There was no response. He didn't look surprised or upset or whatever.

Q: So he just sat there?

A: Yes.

Q: Did he say anything?

A: No.

Q: Did he deny knowledge?

A: No.

Q: Now, after you told—after you told him about the marijuana in the car, what happened next?

A: I read him his rights, and he decided to talk to us when we continued or started the interview.

Agent Salazar further testified that Velarde told him that he went to Mexico to have a mechanic named Jose Meza fix a battery charger problem on the Grand Marquis. Although Velarde initially said that he dropped the car off at 8:00 p.m. on January 22, 1999, and picked it up at midnight, he later told the agents that he picked up the car at 8:00 a.m. the following morning. When Agent Salazar confronted Velarde with the inconsistency in his story, he had no response.

According to Agent Salazar, Velarde said he spent the time between dropping off and picking up the automobile at a restaurant in an area of Tijuana called Las Islas and going to a Tijuana club named Siete Copas. On cross-examination, Agent Salazar clarified that Velarde also told him about meeting a prostitute at the club, going with her to a hotel, and spending $70 for the hotel and for her services. Agent Salazar also stated that Velarde told him about going to a swap meet in Tijuana after picking up the automobile.

Velarde testified in his own defense. He claimed that he did not understand much of Agent Salazar's Spanish and thus "perhaps I didn't explain myself well and he may have taken it another way." Velarde testified that on January 22, 1999, he went to a restaurant in Tijuana called Las Islas and gave his car to an attendant named Jose Meza. Velarde explained that he told Meza that the car occasionally had starter problems and that Meza said he would check the problem if it occurred while he moved the car. After dinner, Velarde retrieved his car and went to a dance club.

There, he met a prostitute named Gloria and told her where he worked and lived. The pair eventually left the club and spent the entire night together in a nearby hotel. While they were both there, he was in the shower for fifteen to twenty minutes. His keys and wallet, which contained business cards with his business address, were in the room with Gloria during that time. According to Velarde, he left the hotel the next morning and drove back to California.

Noting that there was no direct evidence of Velarde's knowledge or intent, the prosecutor began her closing argument by comparing drug organizations to "any other business," which would want "the best person for the job." The prosecutor then compared the characteristics that border agents use to identify a drug courier, *i.e.*, nervous or fidgety, with the type of person a drug organization would select to deceive the agents, *i.e.*, calm and relaxed:

> So now you have a defendant who you've learned was totally relaxed. When he was interviewed by the case agents, he was relaxed when he was told that there was marijuana in the car. He showed no emotion. This defendant was perfect for the job. He's the kind of guy a drug organization would want to hire because he was able to sit there and show nothing.

> Now, if someone is told that they have no idea that there's marijuana in their car, if someone is told we've pulled you over, checked out your car, and we found 63 pounds of marijuana in your car, was he shocked? Was he surprised? Was he enraged? No. He showed no emotion at all. He was able to control any feelings he might have had. He was the perfect guy. He was the perfect guy to bring drugs across the border. He's the kind of guy a drug organization looks for and hires.

The remaining half of the government's closing emphasized the quantity of marijuana, its value in the United States, and the inconsistences in Velarde's initial statements, post-*Miranda* statements, and trial testimony.

The jury convicted Velarde of counts one and two. The district court imposed a sentence of twenty-seven months incarceration, three years supervised release, and a $200.00 fine. Velarde timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. Post–Arrest, Pre-*Miranda* Silence

■ Reviewing the question *de novo*, *see United States v. Soliz*, 129 F.3d 499, 503 (9th Cir.1997), *overruled on other grounds by United States v. Johnson*, 256 F.3d 895 (9th Cir.2001) (en banc), we conclude that because the government's evidence of a lack of physical or emotional reaction was tantamount to evidence of silence, the district court erred in admitting it. The admission of this evidence violated Velarde's Fifth Amendment privilege against self-incrimination.

■ The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This right to remain silent carries an "implicit ... assurance" that silence will carry no penalty. *Doyle*, 426 U.S. at 618, 96 S.Ct. 2240; *United States v. Foster*, 985 F.2d 466, 468 (9th Cir.1993); *see also Miranda v. Arizona*, 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ("[I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation."). Although *Miranda* warnings are required to reduce the risk that suspects subject to the inherent coercion of custodial interrogation will be compelled to incriminate themselves, *see New York v.*

*Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), "[t]he warnings mandated by [*Miranda* are] a prophylactic means of safeguarding Fifth Amendment rights," *Doyle,* 426 U.S. at 617, 96 S.Ct. 2240,—they are not the genesis of those rights. Therefore, once the government places an individual in custody, that individual has a right to remain silent in the face of government questioning, regardless of whether the *Miranda* warnings are given. *Id.* Moreover, the government may not burden that right by commenting on the defendant's post-arrest silence at trial. *Griffin v. California,* 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) ("[C]omment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice,' which the Fifth Amendment outlaws.") (citation omitted); *Miranda,* 384 U.S. at 468 n. 37, 86 S.Ct. 1602 ("The prosecution may not, therefore, use at trial the fact that [the defendant] stood mute or claimed his privilege in the face of accusation.").

■ This principle was affirmed in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Defendants Doyle and Wood were arrested and charged with selling ten pounds of marijuana to a local narcotics bureau informant. *Doyle,* 426 U.S. at 611, 96 S.Ct. 2240. Following the arrest, Agent Beamer read both defendants their *Miranda* rights and began questioning them. During this interrogation, neither defendant offered an exculpatory story, choosing instead to remain silent. *Id.* at 617, 96 S.Ct. 2240. At trial,

however, both defendants offered an exculpatory story, which "presented some difficulty for the prosecution, as it was not entirely implausible and there was little if any direct evidence to contradict it." *Id.* at 613, 96 S.Ct. 2240. The State argued that the "discrepancy between [the] exculpatory story at trial and silence at [the] time of arrest [gave] rise to an inference that the story was fabricated somewhere along the way." *Id.* at 616, 96 S.Ct. 2240. In response, the Court held that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at 618, 96 S.Ct. 2240 (footnote omitted).[1]

In *United States v. Whitehead,* 200 F.3d 634 (9th Cir.), *cert. denied,* 531 U.S. 885, 121 S.Ct. 202, 148 L.Ed.2d 141 (2000), we recognized that because the right to remain silent derives from the Constitution and not from the *Miranda* warnings themselves, regardless of whether the warnings are given, absent waiver, comment on the defendant's exercise of his right to silence violates the Fifth Amendment. There, Whitehead was charged and convicted with importation of marijuana, in violation of 21 U.S.C. §§ 952 and 960 and possession of marijuana with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). *Id.* at 637. Whitehead and his brother were arrested after attempting to smuggle 54.85 pounds of marijuana from Mexico into the United States underneath the rear bumper of a red 1988 Hyundai Excel. *Id.* at 636.

---

1. *Doyle* referred to the use of post-arrest, post-*Miranda* silence for impeachment. *See Doyle,* 426 U.S. at 619, 96 S.Ct. 2240. The government may still use a defendant's post-arrest, pre-*Miranda* silence for impeachment (but not, as this opinion explains, in its case-in-chief). *See Greer v. Miller,* 483 U.S. 756, 762, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (" 'absen[t] the sort of affirmative assurances embodied in the *Miranda* warnings,' the Constitution does not prohibit the use of a defendant's postarrest silence to impeach him at trial") (quoting *Fletcher v. Weir,* 455 U.S. 603, 607, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982)); *United States v. Hernandez,* 948 F.2d 316, 323 n. 4 (7th Cir.1991) ("A defendant's silence *before Miranda* warnings is admissible to impeach the defendant.") (citation omitted).

After the "United States Customs Service Inspector Robert Garcia and another official [ ] escorted Whitehead and his brother to the secondary office, placing the two in custody for the purposes of *Miranda*," Whitehead remained silent. *Id.* 636–37 (footnote omitted). Despite not being read his *Miranda* rights, Whitehead continued to remain silent as Inspector Garcia searched the car and the clothes of Whitehead and his brother. *Id.* at 637. During the government's case-in-chief, the prosecutor solicited testimony from Inspector Garcia affirming that Whitehead remained silent during the pre-*Miranda* interrogation at the border. *Id.* at 637–38. At closing, the prosecutor argued to the jury that Whitehead remained silent because he knew he was guilty. *Id.* at 638. We held that the government may not comment on a defendant's post-arrest, pre-*Miranda* silence in its case-in-chief because such comments would "act [ ] as an impermissible penalty on the exercise of the ... right to remain silent." *Id.* (citation omitted) (alterations in original). We concluded that "regardless whether the *Miranda* warnings [are] actually given, comment on the defendant's exercise of his right to remain silent [is] unconstitutional." *Id.* at 638 (citing *Douglas v. Cupp*, 578 F.2d 266, 267 (9th Cir.1978)).

Here, Velarde seeks to protect the very right at issue in *Whitehead*—his right to remain silent after he was placed in police custody but before he received his *Miranda* warnings. The government attempts to distinguish *Whitehead* on two grounds: (i) the bulk of the government's evidence was a comment on Velarde's "demeanor"—not his silence; and (ii) because, once informed of his *Miranda* rights, Velarde waived them, his pre-*Miranda* silence should be considered waived. We disagree.

## A. Violation of Fifth Amendment Rights

Although the government concedes that it improperly elicited some testimony that commented on Velarde's silence, it contends that this was only "a passing reference" and that this "brief reference was simply a shorthand way of saying that Velarde's demeanor did not change in reaction to this news." The government does not specify which testimony it concedes was a comment on silence, and which it contends was a comment on demeanor. It argues, however, that the bulk of Agent Salazar's testimony and the entirety of the government's closing arguments commented on Velarde's "demeanor," not his silence. We agree that the government may offer evidence of demeanor, *see United States v. Barbosa*, 906 F.2d 1366, 1368 (9th Cir.1990), and may also offer physical evidence, *see Schmerber v. California*, 384 U.S. 757, 764, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). At issue here, however, is neither demeanor nor physical evidence. Agent Salazar's testimony about Velarde's lack of response when confronted with the sixty-three pounds of marijuana in his gas tank was testimony about Velarde's silence during the pre-*Miranda* questioning.

The Supreme Court has distinguished "physical" and "demeanor" evidence from "testimonial" evidence, holding that evidence of the former does not engender Fifth Amendment protection. *Pennsylvania v. Muniz*, 496 U.S. 582, 592, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990). Demeanor evidence often involves the admission of evidence concerning a defendant's "slurr[ed] speech," *Muniz*, 496 U.S. at 592, 110 S.Ct. 2638, "apparent nervousness," *Barbosa*, 906 F.2d at 1368, or a defendant's demeanor during a polygraph test, even though the results may not be admissible, *Rothgeb v. United States*, 789 F.2d 647, 651 (8th Cir.1986). Likewise,

physical evidence includes one's fingerprints, handwriting, vocal characteristics, stance, stride, gestures, or blood characteristics. *See, e.g., Schmerber,* 384 U.S. at 764, 86 S.Ct. 1826 (blood test was physical, not testimonial evidence and thus not protected by the Fifth Amendment).

Here, however, Velarde did not physically or emotionally react when confronted with incriminating evidence; in the words of Agent Salazar, "he just sat there." From this lack of response, otherwise known as silence, derives the entirety of the government's pre-*Miranda* "demeanor" evidence. In describing Velarde's pre-*Miranda* non-responsiveness, Agent Salazar testified that Velarde "didn't look surprised or upset;" that "[t]here was no response;" that he did not "say anything;" and that he did not "deny knowledge." Each of these comments described the same thing—that Velarde did not react at all, but remained silent in the face of confrontation.

Silence is defined as "the fact of abstaining from speech (altogether, or on a particular subject); a state or condition resulting from this; muteness, taciturnity." *The New Shorter Oxford Dictionary* 2861 (4th ed.1993). The non-reaction the government seeks to introduce as "demeanor" evidence is not an action or a physical response, but a failure to speak. There was no outward physical manifestation to comment upon other than Velarde's "state or condition of silence."

The prosecutor did not ask Agent Salazar, "What was Velarde's physical response (to being confronted with the sixty-three pounds of marijuana in his car)?" The word "physical" appears nowhere in the colloquy at issue. Rather, the prosecutor's question, "and what was his response" called for a statement as to Velarde's testimonial response, and the answer "he just sat there" was a figure of speech connoting silence. We do not quarrel with the notion that the prosecutor could have asked about Velarde's non-testimonial physical response, but that was not the question asked. For example, testimony that Velarde was sweating or vomiting would have been admissible. On the other hand, the prosecutor could not have asked about Velarde's communicative physical response. For example, testimony that Velarde shook his head to signify "no" would have been inadmissible.

The similarity between the government's use of testimony about Velarde's non-response and the government's use of testimony about Whitehead's silence to incriminate each defendant is striking. In *Whitehead,* testimony elicited in the government's case-in-chief and closing argument relied upon Whitehead's failure to "respond" to his arrest:

> Inspector Garcia leads him in there, pats him down—you know, T.V.—takes off his shoes and his belt and puts him in a cell. What do you do at that point? What do I do? What would anyone of us do? What is going on here? What the heck is going on? Why am I being treated like this? Why am I being arrested? But you don't say that, if you know; and the defendant didn't say a word because he knew. He knew there were drugs in the car.

*Whitehead,* 200 F.3d at 638 (closing arguments). We held that this use of the defendant's failure to respond to his arrest "plainly infringed upon Whitehead's privilege against self-incrimination." *Id.* at 639 (citation omitted).

The government attempts to distinguish *Whitehead* by arguing that the majority of the disputed evidence in *Whitehead* was silence and the "bulk" of the evidence in the present case is "demeanor evidence." We cannot place constitutional

significance on the government's post-hoc characterization of the evidence. Whether the government argues that a defendant remained silent or describes the defendant's state of silence, the practical effect is the same—the defendant's right to remain silent is used against him at trial. To hold otherwise would circumvent the constitutional protection against self-incrimination: introducing evidence at trial that the defendant remained silent in the face of incriminating evidence would violate the Fifth Amendment, but describing what a defendant looked like in remaining silent would not. This distinction would undermine our well-established rule that the government may not use evidence of a defendant's post-arrest, post-*Miranda* silence at trial, for impeachment or during its case-in-chief, because such evidence penalizes the exercise of a constitutional right. *See Doyle,* 426 U.S. at 618, 96 S.Ct. 2240 ("[I]t would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."); *Miranda,* 384 U.S. at 468 n. 37, 86 S.Ct. 1602 ("[I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation."); *Whitehead,* 200 F.3d at 637 (noting that the government may not comment on post-arrest silence because such comments would constitute a penalty on the right to remain silent); *Veloria,* 136 F.3d at 652 ("The right to remain silent carries an implicit assurance that silence will carry no penalty."); *Douglas,* 578 F.2d at 267 ("The introduction of such testimony [regarding silence] acted as an impermissible penalty on the exercise of the petitioner's right to remain silent.").

Moreover, if we were to permit the use of silence in the face of questioning about incriminating evidence, we would be allowing the government to manufacture additional incriminating evidence for later use at trial. When confronted with evidence of a large quantity of drugs in his car, Velarde was faced with a Catch 22: if he remained silent, the government could use, as it did, his silence as powerful and persuasive evidence that Velarde was the consummate drug carrier—hired for his lack of emotion, and fully knowledgeable about the drugs he carried. If, on the other hand, Velarde denied the existence of the drugs, a response wholly consistent with innocence, the government would be able to impeach him with the physical or other evidence tending to discredit him. Thus, whatever Velarde's response, the government would now have available to it additional cumulative evidence of guilt to be argued to the jury. It is the self-incriminating nature of this evidence that the Fifth Amendment protects against.

The only other circuit to directly address whether it is permissible for the government to characterize silence or non-responsiveness as demeanor evidence is in accord. *United States v. Elkins,* 774 F.2d 530, 537–38 (1st Cir.1985); *cf. United States v. Rivera,* 944 F.2d 1563 (11th Cir. 1991) (suggesting in dicta that it may be impermissible to characterize non-responsiveness or silence as demeanor in some contexts, but declining to reach this issue). The First Circuit held that admitting evidence of a defendant's non-responsiveness as "demeanor evidence" is a "derogation of the Fifth and Fourteenth Amendments." *Elkins,* 774 F.2d at 536–38. In *Elkins,* the government argued that admitting "testimony as to a defendant's non-responsiveness" does not constitute a Fifth Amendment violation because the testimony should be treated as "demeanor" evidence that is not protected by the Fifth Amendment. *Id.* at 536 n. 4, 537. Relying on *Doyle,* 426 U.S. at 618, 96 S.Ct. 2240, the

First Circuit squarely rejected this argument:

> *Doyle* cannot be avoided simply by treating testimony as to a defendant's non-responsiveness after receiving *Miranda* warnings as "demeanor" evidence. *Doyle* has been strictly applied so that any description of a defendant's silence following arrest and *Miranda* warning, whether made in the prosecutor's case in chief, on cross-examination, or in closing arguments, constitutes a violation of the Due Process Clause.

*Id.* at 537. The court concluded that "[a] *Doyle* violation occurs not only when the objectionable comments explicitly refer to a defendant's failure to answer questions put to him or her, but when the reference to defendant's silence is more oblique." *Id.*

Although *Elkins* involved post-arrest, post-*Miranda* silence, its rationale supports our conclusion. We reaffirm our decision in *Whitehead* and hold that the district court erred by allowing the government to comment on Velarde's post-arrest, pre-*Miranda* silence.

### B. Waiver

The government further argues that *Whitehead* is not controlling because, unlike the defendant in *Whitehead,* Velarde subsequently waived his right to remain silent and confessed to the offense. Therefore, the government contends that any passing reference the prosecution made regarding Velarde's silence could not have been construed as a comment on his right to remain silent, because Velarde's post-*Miranda* waiver also waived his Fifth Amendment right to remain silent prior to receiving the *Miranda* warnings. We disagree.

 Although we have not precisely held that a defendant's post-arrest, post-*Miranda* waiver does not act as a waiver

of his post-arrest, pre-*Miranda* silence, we find such a rule to be implicit in the Supreme Court's decision of *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and to logically follow from our decision in *United States v. Gonzalez–Sandoval,* 894 F.2d 1043 (9th Cir. 1990). In *Oregon v. Elstad,* the defendant made several incriminating statements after he was placed into custody, but before he was read his *Miranda* rights. When his rights were eventually read to him, however, he waived them, providing statements that the government then used against him at trial. The Court held that although the law enforcement officers' failure to immediately administer *Miranda* warnings did not "taint" the admissions made after the defendant received and waived his *Miranda* rights, the pre-*Miranda* statement must be excluded. *Oregon,* 470 U.S. at 309, 318, 105 S.Ct. 1285 (stating that "*Miranda* requires that the unwarned admission must be suppressed," despite the fact that the defendant's subsequent, post-*Miranda* waiver statements were admissible). According to the Court:

> [T]he dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver.

*Id.* at 318, 105 S.Ct. 1285. Implicit in this rule is the principle that the waiver of *Miranda* rights renders only subsequent statements admissible. Those statements made before the receipt of *Miranda* warnings remain inadmissible, despite a later waiver of Fifth Amendment rights. *Id.*

In *United States v. Gonzalez–Sandoval,* we addressed whether pre-*Miranda* statements, as opposed to silence, were admissible. There, Gonzalez was arrested by the Border Patrol for being present illegally in the United States. 894 F.2d at 1046. Before he received *Miranda* warnings, the Agent interrogating Gonzalez asked "where he was born and whether he had documents verifying his legal entry into the United States." *Id.* at 1046. Not until the Agent ran a records check and learned of Gonzalez's previous deportation did he advise Gonzalez of his *Miranda* rights. *Id.* Subsequently, Gonzalez waived those rights and admitted to having been previously deported. *Id.* at 1049. Although we concluded that Gonzalez's post-*Miranda* waiver confession was admissible, we further held that despite his subsequent waiver of his *Miranda* rights, Gonzalez's pre-*Miranda* "responses to [the] Agent['s] questions about his place of birth, immigration status, and use of aliases" were "obtained in violation of *Miranda*" and therefore were inadmissible. *Id.* at 1047.

On similar facts, the Seventh Circuit has held that a subsequent waiver of *Miranda* rights has no effect on the admissibility of post-arrest, pre-*Miranda* silence. *United States v. Hernandez,* 948 F.2d 316 (7th Cir.1991). In *Hernandez,* the prosecution elicited testimony from the arresting officer as to the defendant's post-arrest, pre-*Miranda* silence, asking whether "at the time [the defendant] was placed under arrest, did he make any immediate response?" *Id.* at 322. The witness answered "No." *Id.* The Seventh Circuit concluded that irrespective of his subsequent waiver and later statements, the prosecutor's reference to defendant's pre-*Miranda* silence violated the defendant's Fifth Amendment rights. *Id.* at 322–23.

■ We also hold that a subsequent waiver of *Miranda* rights does not render

admissible comment on the defendant's pre-waiver silence. Therefore, Velarde's eventual waiver of his *Miranda* rights was irrelevant to the question of admissibility of his post-arrest, pre-*Miranda* silence.

## C. Harmless Error

■ Because Velarde's counsel properly objected by motion in limine and at trial to the admission of testimony regarding Velarde's post-arrest, pre-*Miranda* silence, we must next consider whether the district court's erroneous decision to admit the evidence of silence was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."); *United States v. Kallin,* 50 F.3d 689, 693 (9th Cir.1995) ("Whether improper references to a defendant's silence ... are harmless is reviewed under a 'harmless-beyond-a-reasonable-doubt' standard.") (citation omitted); *see also* Fed. R.App. P. 52; *cf. Whitehead,* 200 F.3d at 638–39 (finding the same constitutional violation as here, but affirming the conviction under the *plain error* standard of review).

■ Under the harmless error standard, we must determine whether "absent the prosecutor's allusion to [Velarde's silence and demeanor], is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty." *United States v. Hasting,* 461 U.S. 499, 510–11, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (citation omitted). In the context of comments on silence, we consider three factors: "[1] the extent of comments made by the witness, [2] whether an inference of guilt from silence was stressed to the jury, and [3] the extent of other evidence suggesting defendant's guilt." *United States v. Newman,* 943 F.2d 1155, 1158 (9th Cir.1991)

(applying harmless error review); *see also Kallin,* 50 F.3d at 693 (quoting and following *Newman*); *Scarborough v. Arizona,* 531 F.2d 959, 962 (9th Cir.1976) (relied upon by *Newman*). The burden of proving a constitutional error harmless beyond a reasonable doubt rests upon the government. *Chapman,* 386 U.S. at 24, 87 S.Ct. 824.

Upon consideration of the *Newman* factors, we cannot conclude that the government has met its burden. The first *Newman* factor requires us to consider the extent of comments made by the witness regarding the defendant's silence. Here, the quantitative extent of Agent Salazar's testimony about Velarde's pre-*Miranda* silence and demeanor was not great in relation to the remainder of his testimony. The government correctly notes that the bulk of Agent Salazar's testimony related to a variety of other matters, notably the discovery of marijuana, the inconsistencies in Velarde's stories, and the other results of his investigation. However, the qualitative extent, *i.e.,* the manner of questioning and the repeated nature of the questions, endowed the fact of Velarde's silence with great significance and laid the foundation for the prosecutor's closing where his silence was heavily relied upon. Thus, this factor weighs against a finding of harmless error.

The second *Newman* factor also weighs against the harmlessness of the error. The government used Agent Salazar's testimony to its full potential, drawing a direct inference of guilt during its closing argument. It argued that Velarde's non-reaction in the face of arrest demonstrated that he was "the perfect guy to bring drugs across the border." If he was hired by a sophisticated drug organization to transport the drugs, the government argued he would necessarily have known of that fact. Thus, the government used the

testimony about Velarde's silence as its principal means of meeting its burden on the critical element of knowledge. *See* 21 U.S.C. §§ 952, 960 (1994) (requiring that the government prove beyond a reasonable doubt that defendant knew that he brought a prohibited drug into the United States).

Finally, the government's remaining evidence was not so strong as to warrant a conclusion that the error was harmless. As the government itself concedes, faced with a lack of direct evidence, it relied entirely upon circumstantial evidence to convict Velarde. In a case involving even greater circumstantial evidence of guilt, *United States v. Foster,* 227 F.3d 1096 (9th Cir.2000), we concluded that the improper admission of a prior conviction was not harmless beyond a reasonable doubt. There, the defendant was caught attempting to enter the United States with over sixty-eight pounds of marijuana hidden in his vehicle. *Id.* at 1098. The defendant's car, which he did not own, smelled strongly of fabric softener, a substance often used to disguise the smell of narcotics, and the defendant wore poorly fitting clothes and shoes given to him by a person with an unknown last name. *Id.* at 1100. Furthermore, as here, the defendant gave various inconsistent statements to Customs officials that were introduced against him at trial. *Id.* at 1098–99. We concluded, however, that because the defendant offered "plausible, innocent explanation[s]" for his presence in the automobile and for the inconsistencies in his statements to Customs officials, Foster's "credibility was of utmost importance." *Id.* at 1101. Thus, the erroneous admission of his prior offense for impeachment purposes damaged his credibility and therefore could not be harmless error. *Id.*

Velarde's theory of the defense, while not necessarily compelling, is equally plau-

sible. Velarde testified that he met a prostitute in a bar and told her that he planned to return to Hemet, California the following day. He testified that he was apart from her for twenty minutes while he was in the shower. Although the government contends that this was insufficient time for a member of a drug organization to copy Velarde's key, copying Velarde's keys was not a necessary prerequisite to obtaining access to his car. Someone would only need to know that Velarde was returning to California the following day and which car was his, information that the prostitute could have easily imparted to someone in twenty minutes. Nor did the fact that Velarde's gas tank only held two gallons of gas render his story implausible. Someone knowledgeable of the drugs in the car could have followed Velarde across the border, planning to retrieve the drugs as soon as Velarde ran out of gas.

Furthermore, although a jury could rely solely on Velarde's inconsistent statements to reach a guilty verdict, those inconsistencies do not lead us to conclude beyond a reasonable doubt that the jury would have convicted Velarde. Velarde offers an equally plausible explanation that the inconsistencies resulted from difficulties he had in communicating with Agent Salazar. Velarde testified that: "The officer told me that he knew a little Spanish, but I didn't understand him in some occasions what he would tell me." Thus, Velarde suggested, "between what's been heard and what I said, there are some things that he didn't understand what I was trying to tell him."

Finally, the four-day jury deliberations were relatively lengthy for this two-count drug importation and possession case. Longer jury deliberations "weigh against a finding of harmless error [because l]engthy deliberations suggest a difficult case." *United States v. Varoudakis,* 233 F.3d 113, 126 (1st Cir.2000); *Dallago*

*v. United States,* 427 F.2d 546, 559 (D.C.Cir.1969) ("The jury deliberated for five days, and one would expect that if the evidence of guilt was overwhelming the jury would have succumbed much sooner.") (footnote omitted); *see also United States v. Williams,* 212 F.3d 1305, 1313 (D.C.Cir.) (Silberman, J., dissenting) ("[W]e are willing to take into consideration the length of jury deliberations in our harmless error review."), *cert. denied,* 531 U.S. 1056, 121 S.Ct. 666, 148 L.Ed.2d 568 (2000).

Given that each of the *Newman* factors weighs against a finding of harmlessness, that the jury reasonably could have believed Velarde's explanations, and the length of the jury deliberations, we hold that the admission of Velarde's post-arrest, pre-*Miranda* silence was not harmless error. We therefore reverse Velarde's conviction.

### III. Motion to Suppress

Velarde also argues that the district court erred in denying his motion to suppress his statements taken in violation of Article 36 of the Vienna Convention. This argument is foreclosed by *United States v. Lombera–Camorlinga,* 206 F.3d 882, 885–88 (9th Cir.2000) (en banc), where we held that "the exclusion in a criminal prosecution ... obtained as the result of post-arrest interrogation is not among" the judicial remedies available to individuals under the Vienna Convention. *Lombera–Camorlinga,* 206 F.3d at 885. Velarde thus has no right to suppression of his statements taken in violation of the Convention.

### IV. Conclusion

We hold that the district court erred in allowing comment on Velarde's post-arrest, pre-*Miranda* silence. Because this error was not harmless beyond a reasonable doubt, Velarde's conviction is reversed and

this case is remanded to the district court for further proceedings. We therefore need not address Velarde's remaining claims.

REVERSED and REMANDED

GOULD, Circuit Judge, with whom FERNANDEZ and SILVERMAN, Circuit Judges, join, Concurring in part and Dissenting in part:

I concur in part in the majority opinion's analysis concerning error in comment on post-arrest, pre-*Miranda* silence. In my view, this analysis is correct as applied to the questions whether the accused said anything (Q: "Did he say anything?" A: "No") or denied anything (Q: "Did he deny knowledge?" A: "No"). I agree that these questions and their answers offered into evidence violated the Fifth Amendment rights of the accused. I also fully agree that there was no waiver arising from the subsequent waiver of *Miranda* rights.

Nonetheless, I respectfully dissent from the opinion's application of the Fifth Amendment prohibition against comment on silence to what I consider the demeanor evidence (Q: "What was his response when you told him there was marijuana found in the vehicle?" A: "There was no response. He didn't look surprised or upset or whatever." Q: "So he just sat there?" A: "Yes."). And I respectfully dissent as well from the majority opinion's harmless error analysis. I would affirm the judgment of the district court, thinking the error committed was smaller in scope than is presented by the majority opinion, and in any event concluding that the error was harmless beyond a reasonable doubt.

Evidence of demeanor is different than evidence of mere silence. Demeanor evidence should normally be admissible because it is non-testimonial. Justice Holmes wrote of a comparable distinction almost a century ago:

> [T]he prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof.

*Holt v. United States*, 218 U.S. 245, 252–53, 31 S.Ct. 2, 54 L.Ed. 1021 (1910) (quoted in *Schmerber v. California*, 384 U.S. 757, 763, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)).

I write to explain my views on the distinction between evidence of silence and evidence of demeanor. Although the majority opinion in this case does not accept this distinction for constitutional purposes, I rather think this distinction is required here by controlling precedent. Asking, "what did he do," differs from asking, "what did he say?" The former does not relate to a communicative response and does not violate the defendant's Fifth Amendment rights. Demeanor is not a proxy for silence. For demeanor relates to a defendant's physical characteristics, says more than silence, and is something other than silence.

I

I have noted above the questions that I consider proscribed comments on silence, as compared to the questions that are inquiries on demeanor, which I think were permissible. I agree with the majority opinion's view that Fifth Amendment rights were offended by the questions about whether Velarde–Gomez said anything or denied anything when confronted with discovery of contraband almost completely filling his gas tank. But I consider it different to inquire whether there was

any response; whether Velarde–Gomez was surprised or upset; and whether he just sat there. In my view, questions about the accused's response and exhibited mental state are not the same as questions about silence. The district court's decision to admit evidence of the defendant's demeanor was correct. My views are in accord with those of the original panel's opinion:[1]

> [E]vidence of one's fingerprints, handwriting, vocal characteristics, stance, stride, gestures, or blood characteristics ... as well as evidence of an intoxicated person's "slurring of speech and other evidence of lack of muscular coordination" does not violate the Fifth Amendment ... Thus, evidence of one's physical characteristics is nontestimonial....
>
> .... Like admissible evidence of gestures or muscular coordination, evidence of demeanor relates to physical characteristics, not efforts at communication. It describes one's mood rather than one's answers to questions.... Pursuant to *Schmerber* and its progeny, evidence of Velarde–Gomez's physical reactions and emotional state is evidence of his physical characteristics rather than communicative evidence.... [S]uch evidence is not testimonial and thus its admission into evidence does not violate Velarde–Gomez's Fifth Amendment rights.

*United States v. Velarde–Gomez,* 224 F.3d 1062, 1070–71 (9th Cir.2000) (citations omitted), *rev'd en banc,* 269 F.3d 1023, 2001 WL 1262610 (9th Cir.2001). Evidence of demeanor is not communicative or testimonial because it is evidence of a physical response, and not the defendant's

"knowledge of facts relating him to the offense ... [or] his thoughts and beliefs [about the offense]." *Doe v. United States,* 487 U.S. 201, 213, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988).

I can understand why the majority's reasoned opinion has difficulty in this case making the distinction between questions about the physical response of demeanor and questions about silence. For in this case, the questions about demeanor are parceled together in a series with improper questions about what the defendant said or denied. Perhaps just as people may be known by their associates, so too questions may be known by company they keep, and given a meaning in context that they would not have alone. Thus questions here that address demeanor are thought by the majority to address silence. The majority's proscription of demeanor evidence in this case is understandable in this peculiar context but it fails to appreciate the subtle but important distinction between conduct intended as an assertion and demeanor. For example, in discussing *Whitehead,* the majority treats the impermissible comments about what the defendant *said* as identical to comments made about how Velarde–Gomez *acted.* Respecting that the difference is important, I would prefer still to follow *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), or if needed to extend it,[2] to make clear that neither *Miranda* nor the Fifth Amendment prevents inquiry about post-arrest demeanor before *Miranda* warnings are given. This approach might have the benefit of giving law enforcement a clearer

---

**1.** Although the original panel opinion is no longer precedent because of our en banc process, I adopt its reasoning as persuasive.

**2.** I read the United States Supreme Court's decision in *Schmerber* to require us to make the important distinction between demeanor and silence. Thus I would follow *Schmerber.* But if *Schmerber* were read more narrowly, then I would extend it to demeanor as a matter of our circuit law.

guide for permissible action. For example, what if the only question asked here of the accused and related to the jury was "What was his response when you told him there was marijuana found in the vehicle?" If this question was not side-by-side with questions about what the defendant said, does the rule announced by the majority opinion permit it? Does the word response convey a verbal response? And if this question about "response" is still too close to a question on silence, then what if the only questions asked about the confrontation with the contraband evidence were questions such as "was he upset?" or "was he angry?" or "was he nervous?" I see these inquiries as calling for physical evidence, asking about physical response, inquiring about exhibited emotional state, and I do not see any way in which *Miranda* or the Fifth Amendment would outlaw such questions under existing precedent any more than testimony that a suspect began to tremble or to sweat profusely would be outlawed.

The distinction between admissible evidence of conduct or physical response and inadmissable evidence of silence is made clear when we consider how the law treats flight. "Evidence of flight is generally admissible as evidence of consciousness of guilt and of guilt itself." *United States v. Harris,* 792 F.2d 866, 869 (9th Cir.1986). Evidence of demeanor is similar to evidence of flight because both are physical responses and both are non-testimonial. If, after a stop or arrest, an officer questions a suspect and the suspect flees, then evidence of such conduct is surely admissible under *Harris* because it shows guilt. The majority opinion rule excluding demeanor evidence is inconsistent with this principle. Whether a suspect has demeanor that is cool or excited when questioned, whether his jaw drops open or he breaks out in a sweat, that conduct should be admissible and the trier of fact may give the demeanor evidence such weight as is appropriate. The majority position incorrectly may be read in a pre-*Miranda* warnings context to outlaw the use of evidence of demeanor. But for me, unless wholly altered by context, evidence of demeanor is more in the nature of conduct than testimony. Demeanor, like flight, is a physical response that has probative value for a jury. As here, the demeanor of non-response may include the idea that an accused person was silent. But it is not for that reason alone a comment on silence. In fact, the demeanor inquiries here asked for and received other information that may have been relevant to a jury. Was defendant showing surprise? Did defendant look upset? Was he angry? Was he cool and collected? This information goes well beyond silence and is properly viewed in the realm of physical response. *Cf. Pennsylvania v. Muniz,* 496 U.S. 582, 590–600, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (distinguishing between permissible evidence of *how* a DUI suspect spoke, his slurred speech, from impermissible testimony concerning the *content* of his speech, what he communicated). So long as there is no inquiry about silence, explicitly or implicitly as a result of context, it is for the jury to weigh demeanor evidence. This properly includes evidence of visage, composure, surprise or anger, or any other evidence of how the defendant acted except for a proscribed comment on silence. The Fifth Amendment should not be held to prohibit or screen out evidence of an accused person's composure, temperament, or demonstrated emotions when under pressure of events.[3]

---

**3.** I would leave open whether in a particular case such inquiry about demeanor in context offends due process. But I do not think this is such a case. Indeed, even if I thought this

## II

Even if, as the majority opinion concludes, the district court erred in admitting the evidence of the defendant's demeanor, this error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Newman*, 943 F.2d 1155, 1158 (9th Cir.1991).

In deciding whether the district court's error was harmless, the majority looks at the *Newman* factors: (1) the extent of the challenged comments; (2) whether an inference of guilt from silence was stressed in argument to the jury; and (3) an evaluation of other evidence of guilt. Assuming that in this case demeanor equates with silence, I would have little quarrel with the majority's discussion on the first of the *Newman* factors. The related series of questions was extensive. The weight to be given the second factor is not entirely clear. In closing argument the prosecution stressed the questions that I call demeanor questions and did not mention the testimony of questions and answers about lack of statement or denial. Notwithstanding, if for this harmless error analysis I assume the majority correct to equate demeanor with silence, then I view the majority's discussion of the second factor as fair. But the majority gives inadequate weight to the dispositive third factor, other and unmistakable evidence of guilt.

We are trying to decide if we can say beyond a reasonable doubt that the jury would have decided on guilt the same way absent the constitutional error. And the way in which we are to apply this standard is clear:

> [A] court must approach [the Chapman reasonable-doubt standard] by asking whether the force of the evidence pre-

sumably considered by the jury ... is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of [the trial error].

*Yates v. Evatt*, 500 U.S. 391, 405, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991), *overruled on other grounds, Estelle v. McGuire*, 502 U.S. 62, 73 n. 4, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

Here, a consideration of the more than ample evidence of Velarde–Gomez's guilt and a recognition that his asserted tale of innocence is wholly preposterous, weigh heavily towards a conclusion that the district court's error was harmless. In light of the overwhelming evidence of the defendant's guilt, I do not believe for a moment that any reasonable jury would have decided this case any other way even if the prosecution's silence and demeanor questions had never been asked, answered and relayed to the jury.

The evidence before the district court showed unmistakably that the defendant was the driver, sole occupant, and owner of an automobile containing in its gas tank, sixty-three pounds of marijuana and less than two gallons of gas. The defendant also made many inconsistent statements about his visit to Mexico, his activity while there, and the length of time his car was out of his possession. These inconsistent statements and the sole possession in his car of a large tank filled with marijuana are much more than enough for a jury to convict the defendant beyond a reasonable doubt. This was not a thin case but an extremely strong one in which the defendant's only hope was to try to capitalize on prosecutorial error. Not for a moment should we as judges on this record think

were such a case, I would still write separately to clarify that demeanor questions, at least

when not in immediate context of silence questions, do not offend *Miranda*.

that Velarde–Gomez could have been innocent.

As I see it, the defendant must have known about the marijuana in the gas tank. Because of the sixty-three pounds of marijuana, his gas tank could not even hold two gallons of gas. It is improbable beyond a reasonable doubt that a drug smuggler would put sixty-three pounds of marijuana in the gas tank of someone else's car without the driver being aware, knowing that this duped driver could run out of gas and jeopardize the transport of drugs valued at more than $50,000.

Perhaps, the argument goes, someone could have put marijuana in the defendant's gas tank while he was away from his vehicle, with plans to follow him across the border, waiting for him to run out of gas. Next, the argument runs, after the car entered the United States, this guilty drug smuggler could approach the innocent driver's car and somehow secure the 63 pounds of drugs from the duped driver. This argument is fanciful and wholly unpersuasive. Could a drug smuggler really have inserted 63 pounds of marijuana in the defendant's gas tank without first making some mechanical alterations to the car? Is it really possible that the drugs were placed in the gas tank while defendant innocently and temporarily ate, caroused, or slept? It seems to me inescapable that the drugs came on board with the consent and complicity of Velarde–Gomez. An innocent explanation is remote and does not raise reasonable doubt of guilt. Also remote is the idea that the smuggler would proceed in this manner without a knowing accomplice. There is no way that someone smuggling drugs could know for certain that a duped driver would drive straight across the border with less than two gallons of gas without going somewhere else first, perhaps to a gas station, where an obstruction in the gas tank would be immediately discoverable. Indeed, it seems highly unlikely for drug smugglers to entrust their contraband cargo in a stranger's gas tank, not knowing when the driver would head for the border, or if he would head for the border at all. Even if the guilty smuggler knew the innocent driver was planning to go straight to the United States, the innocent driver, driving on a near empty gas tank, would soon run out of gas after crossing the border, thereby inviting complications such as routine help from Good Samaritans or even police, help that drug traffickers likely would not want to encounter.

This entire conveniently-constructed argument is too flimsy a straw to warrant disregard of the jury's solemn and fair conclusion of guilt of a man caught red-handed at the border with his car filled with illicit drugs. The evidence unmistakably shows that the defendant was a knowing participant in drug smuggling. I cannot see how a jury could have credited the defendant's unbelievable tale, regardless of the challenged testimony, nor should we credit this tale in rejecting the sound theory of harmless error.[4]

## III

The district court correctly concluded that evidence of post-arrest, pre-Miranda

---

4. The United States Supreme Court has cautioned us not to set the test for harmless error so high that it can never be met:

> To set [the harmless error] barrier so high that it could never be surmounted would justify the very criticism that spawned the harmless-error doctrine in the first place: "Reversal for error, regardless of its effect

on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it."

*Neder v. United States*, 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (quoting R. Traynor, The Riddle of Harmless Error 50 (1970)).

warning demeanor is admissible. And even if the admission of this evidence was error, it was harmless beyond a reasonable doubt. I would affirm the district court.