Judge GIERKE
delivered the opinion of the Court.
A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of attempted premeditated murder, disobeying the order of a superior commissioned officer, assault consummated by a battery, and communicating a threat, in violation of Articles 80, 90, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 USC §§ 880, 890, 928, and 934, respectively. The adjudged and approved sentence provides for a dishonorable discharge, confinement for 18 years, total forfeitures, and reduction to the lowest enlisted grade. Pursuant to Article 58b, UCMJ, 10 USC § 858b, the convening authority waived automatic forfeitures for the benefit of appellant’s spouse and children. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion.
This Court granted review to determine whether the findings and sentence should be set aside because appellant’s rights under the Fifth Amendment to the United States Constitution and Article 31, UCMJ, 10 USC § 831, were violated when the prosecution elicited testimony that appellant remained *192 silent when he was apprehended, and then commented on his silence during final argument.[1] For the reasons set out below, we reverse.

Factual Background,

The charges arose from two incidents between appellant and his wife. The first incident was on April 30,1998 and the second on May 19,1998.
Mrs. Alameda testified that appellant engaged in a pattern of physical and verbal abuse, domination and control, and threats to kill her that began in 1990, while he was undergoing technical training shortly after he enlisted in the Air Force, and continued until appellant was placed in pretrial confinement as a result of the charges that are the subject of this appeal. Mrs. Alameda was medically evacuated from Kadena Air Base (AB), Okinawa, Japan, in 1991 because of stress and depression that she attributed to appellant’s behavior. She described an incident at McGuire Air Force Base, New Jersey, between appellant’s two tours of duty at Kadena AB, in which appellant held a large butcher knife against her throat, threatened to kill her, and shoved her into a door, fracturing her jaw. Appellant and Mrs. Alameda were divorced in 1993 and then remarried in 1994.
Mrs. Alameda testified that on the morning of April 30, 1998, appellant became upset when he discovered an e-mail message on her computer from a male high school friend of hers who wanted to visit her in Okinawa. According to Mrs. Alameda, appellant tossed the computer off the table, smashed the telephone when she tried to call for help, “flicked” a towel at her head, shoved and grabbed her, punched her on the back of her head and her back, and threatened to kill her. She testified that after appellant departed for work, she e-mailed a friend and neighbor, Tammy Warner, and asked her to call the Air Force Security Forces (Security Forces).
After the Security Forces investigated the incident, appellant’s commander, First Lieutenant (lLt) Deborah Haussler, ordered appellant to move out of the family quarters and into a dormitory. She gave appellant a written order prohibiting him from having any contact with his wife and child, unless it was prearranged by certain named members of the unit.
About a week later, the Family Advocacy therapist contacted lLt Haussler and expressed concern that she had been unable to contact Mrs. Alameda. lLt Haussler visited the therapist and examined Mrs. Alameda’s Family Advocacy file, which revealed that appellant had violated a similar “stay away” order on a previous occasion. lLt Haussler became concerned about Mrs. Alameda’s welfare and decided to visit her at home “to make sure she was okay.” While visiting Mrs. Alameda, lLt Haussler noticed bruises on Mrs. Alameda’s upper arms.
Sometime during the week of May 12, 1998, lLt Haussler received an “early return of dependents” (ERD) packet to allow Mrs. Alameda and her son to leave Okinawa at government expense before appellant completed his tour of duty. She did not know how the ERD packet originated. She informed appellant that he needed to sign the packet. He refused to sign it because he did not want his son to leave Okinawa. lLt Haussler subsequently learned that an ERD request could be approved without the mili *193 tary member’s signature, and she informed appellant on May 18 that the request would be processed without his signature. lLt Haussler contacted Mrs. Alameda at approximately 2:30 p.m. on May 19, and they made an appointment for Mrs. Alameda to sign the ERD request in lLt Haussler’s office at about 3:30 p.m. on that day.
On the morning of May 19, Mrs. Alameda contacted the squadron first sergeant and told him that she needed money for food. When her request was transmitted to appellant, he expressed concern that his money was not being used for food. With the approval of the first sergeant, appellant purchased food at the base commissary and, accompanied by two noncommissioned officers, took the food to the family residence in the early afternoon. While at the residence, appellant gathered some personal clothing and effects, and downloaded some information from his computer. His escorts returned to the squadron, arriving at about 2:15 p.m. Appellant departed the family residence in his own vehicle. He did not return to work with his escorts because, as he told his supervisor, he wanted to see a chaplain.
Chaplain (Captain) Tim Wagoner testified that he received a call from appellant, asking to see him. Base telephone records established that the call was at 1:55 p.m. Appellant told Chaplain Wagoner that he was at Chapel 2; Chaplain Wagoner was at Chapel 1. Chaplain Wagoner agreed to see appellant, who came to Chapel 1. Both chapels are near the housing area where the Alameda residence was located. According to the telephone records and Chaplain Wagoner’s testimony, appellant called his unit at 2:09 p.m. and told them that he was with the chaplain. Chaplain Wagoner testified that he counseled appellant for “a little better than an hour.” He was not sure whether he had finished counseling appellant when he made another telephone call at 3:10 p.m.
Mrs. Aameda departed her on-base place of employment at about 3:00 p.m. in anticipation of her appointment with lLt Haussler. She arrived at home at about 3:15 p.m., saw the groceries, and noticed that some of appellant’s clothing that she had set aside had been disturbed. She called lLt Haussler and complained that appellant had been in the house in spite of the “stay away” order, had left her groceries instead of money, and had rummaged through her belongings. lLt Haussler told her, “come down to my office, sign the ERD letter. We’ll get you off this island as quickly as we can.” Mrs. Alameda responded that she would come immediately.
Mrs. Alameda testified that as she was leaving the residence, appellant entered. She testified that when she saw appellant, she “was hysterical ... [and] completely freaked out that he was standing in front of [her].” She testified that appellant tried to calm her down. She moved to a corner of the room, appellant sat on a couch, and he started asking, “Do you want a divorce? Do you want this?” She did not respond. They began to move around the house. Appellant was putting his hands on her because she “was trying to scream out and stuff,” and “trying to get away.” She testified, “Every move I made, he was right on top of me.”
Mrs. Alameda testified that at one point, appellant was behind her and he covered her mouth and pinched her nose so that she could not breath. She struggled free and ran toward the door. She saw appellant pulling a Hefty garbage bag from his pocket. It was black with yellow straps, tightly folded, and appeared to have never been opened. Appellant was trying to hold her with one hand and unfold the bag with the other. She tried to get away and appellant grabbed her from behind. She testified, “[H]e got it up as far as my face and stuff, and was trying to get it open to where he could get it over my head and stuff, but I ended up ducking down, struggling, and getting out.”
Mrs. Alameda testified that she ran into the bedroom, telling appellant that she would do “[w]hatever you want me to do.” She asked him, “Please, let’s go back into the living room and talk.” As appellant turned around to go into the living room, she slammed the bedroom door and locked it, and then crawled out a window.
She ran across the street, screaming. A neighbor, Melanie Young, let Mrs. Alameda *194 into her house, where Mrs. Alameda called ILt Haussler.
On cross-examination, Mrs. Alameda testified that she did not remember whether she told the Security Forces that appellant had attempted to “strangle” her. In response to defense counsel’s questions, she insisted that appellant did not try to strangle her, but tried to put the garbage bag over her head.
ILt Haussler testified that Mrs. Alameda called her at 3:45 p.m. and was screaming that appellant had been in the house and tried to kill her. ILt Haussler called the Security Forces and then drove to the Alameda residence.
Both ILt Haussler and Ms. Young noticed red marks around Mrs. Alameda’s neck. A doctor at the base hospital noticed that she had superficial abrasions on her neck and scratches on her nose. He also noticed bruises on her arm and leg, and a “goose egg” on the back of her head.
Technical Sergeant (TSgt) Gowan and his wife drove past the Alameda quarters at about 3:15 p.m. on May 19. They both testified that they saw a van, later determined to be appellant’s, parked near the Alameda residence at about 3:15 p.m.
TSgt Eugene Moody, a member of the Security Forces, was on routine patrol when he was directed to respond to the Alameda residence. He knew where it was because he had also responded to the April 30 incident as well as an earlier incident. In response to a question from trial counsel, TSgt Moody testified that when he observed appellant after the April 30 incident, appellant “pretty much was without any emotion, just a plain look....”
When TSgt Moody arrived at the Alameda residence on May 19, he noticed that the bedroom window was open with the blinds hanging out the window. Mrs. Alameda was “excited, and ... definitely upset.” According to TSgt Moody, Mrs. Alameda said that appellant “had a bag around [her] neck” and tried to kill her. He testified that he thought she meant that appellant had put the bag around her neck, but she was not “really clear.” TSgt Moody observed that Mrs. Alameda had red marks on the sides of her neck.
TSgt Moody then began to look for appellant. He began by searching the street adjacent to the Alameda residence and then proceeded to the dormitory area. Based on a description of appellant’s van, he located it in the dormitory area and saw appellant sitting on the dormitory stairs, talking to another individual. TSgt Moody called for another unit to assist. When it arrived, TSgt Moody approached appellant and asked him if he was Airman Alameda, and appellant responded that he was. TSgt Moody asked the person next to appellant to move away, asked appellant for his identification card, and appellant complied. As the trial counsel continued the direct examination of TSgt Moody, the following colloquy occurred, giving rise to the granted issues:
Q. Did he ask any other questions during this time?
A. No.
Q. Did he say anything like, “What do you want? What are you here for?” or anything like that?
A. No.
DC: Objection, Your Honor. Irrelevant.
MJ: Overruled.
[Questions by assistant trial counsel]
Q. Did he make any such statement as that?
A. No, sir, he did not.
Q. After you verified it was, in fact, Senior Airman Tedio Alameda, what did you do next?
A. I informed him that he was going to be apprehended for an alleged assault.
Q. And what did he say or do then?
A. He didn’t say anything. He didn’t do anything. He had a look like [witness stared ahead] and that was it.
Q. Did he ask you why he was being arrested?
A. No, sir, he did not.
Q. Did he act like he knew what was going on?
DC: Objection, Your Honor. Calls for speculation.
*195 MJ: Again, you can ask him what he observed, but you can’t ask him for those types of conclusions of whether or not he did understand.
Q. So, again, when you asked Airman Alameda for his ID card, did he say anything?
A. No, sir.
Q. And when you told him that he was being apprehended, did he say anything? A. He said—
DC: Objection. Asked and answered, Your Honor.
MJ: I’ll allow it, as long as you move on.
ATC: Yes, Your Honor.
Q. How would you describe Airman Alameda’s reaction after you told him he was being placed under arrest?
A. Once again, just as in the previous situation where I had made contact with Airman Alameda, he didn’t have much of a reaction or much emotion at all.
On cross-examination, defense counsel asked TSgt Moody if Mrs. Alameda used the word, “strangle.” He responded,
No. I remember, “He was trying to kill me. He was trying to strangle me. He was trying to—he had a bag around my neck and trying to strangle me.” But the term “strangle” was in there also.
Staff Sergeant (SSgt) Steven Anthony was directed to search appellant’s dormitory for a “dark brown or black plastic garbage bag with yellow drawstrings.” He searched the entire dormitory, and he found a box of Hefty garbage bags matching that description in a trash can in a common bathroom. Later examination by an agent of the Air Force Office of Special Investigations (OSI) revealed that one garbage bag had been removed from the box and 19 were remaining. A latent finger print on the Hefty box was identified as appellant’s. A stipulation of expected testimony of a member of the dormitory custodial staff established that the custodial staff did not use Hefty garbage bags, and that the trash cans in the bathrooms were emptied daily.
In the same trash can, SSgt Anthony found an unopened package of latex gloves and a utility knife, both in their respective original packaging. SSgt Anthony also found a plastic bag bearing the logo of the Army and Air Force Exchange Service (AAFES), containing an unopened roll of 2-inch masking tape, and an AAFES receipt dated May 16 reflecting a purchase of coffee, utility knife, latex gloves, a roll of masking tape, and a pack of GPC cigarettes. The plastic bag was located in a trash can across the bathroom from the one where he found the Hefty garbage bags.
The plastic bag, receipt, roll of masking tape, latex gloves, and utility knife were received in evidence over defense objection. The defense argued that the items had not been connected to appellant. The prosecution argued, that the items were relevant to show premeditation, and that they were sufficiently linked to appellant by the fact that the cigarettes were the same brand appellant smoked, and that all the items were thrown away at about the same time, in the same new condition as the Hefty garbage bags, in the common bathroom of appellant’s dormitory. The military judge admitted the evidence, finding the items relevant to show “some sort of a plan or premeditation.”
On a date not reflected in the record, Mrs. Alameda delivered a pack of GPC cigarettes to the OSI and informed them that appellant had dropped them during the May 19 altercation. A fingerprint lifted from the cigarette pack was not appellant’s.
Appellant did not testify. His counsel concentrated on attacking the credibility of the Government witnesses, especially Mrs. Alameda. In addition, the defense presented the testimony of three witnesses to contradict Mrs. Alameda’s testimony.
The defense presented the stipulated testimony of a senior airman who was involved in the in-processing of appellant into the confinement facility during the early morning hours of May 20, 1998. The stipulation recites that appellant was in possession of a partially empty package of GPC cigarettes when he was in-processed. This testimony was offered to contradict Mrs. Alameda’s statement that appellant inadvertently left *196 his cigarettes in the family quarters on May 19.
The stipulated testimony of Mrs. Crystal Hammond recites that she did not hear any “yelling, screaming, or other loud noises coming from the Alameda residence.” It further adds that Mrs. Hammond would testify that she was asleep with the television on between approximately 3:00 p.m. and 4:00 p.m., with the windows and doors closed, and that, under these circumstances, she could hear very little, if anything, from outside.
A nine-year-old girl, whom Mrs. Alameda observed when she ran out of her apartment, testified that Mrs. Alameda left from her front porch, not from a bedroom window. The girl testified that when she saw Mrs. Alameda, the latter “was standing right on the porch, putting her keys in.” She also testified that Mrs. Alameda locked the doors to her car, which was parked in a space marked with the number of her house.
Before closing arguments, when the military judge instructed the members, he included the following admonition:
The accused has an absolute right to remain silent. You will not draw any inference adverse to the accused from the fact that he did not testify as a witness. The fact that the accused has not testified must be disregarded by you.
During arguments on findings, trial counsel made a specific reference to TSgt Moody’s testimony about appellant’s lack of reaction or response when he was apprehended. The following exchange took place in the presence of the members:
TC: “... And lo and behold, the cops came and picked me up, and I was just sitting there on the steps, didn’t know what this was about,” but didn’t bother even to ask.
Now, does that indicate consciousness of guilt? The police come and say, “Stand up”—
DC: Objection, Your Honor. The accused is under no obligation to make a statement and this drawing an adverse inference from his failure to proclaim his innocence.
TC: Your Honor, the witness testified about what he said and did when they apprehended him.
MJ: I think it’s fair comment on the state of the evidence. However, I will emphasize once again the fact that this accused is under absolutely no obligation to make any statement during the trial in his defense.
TC: Yes, Sir.
TC: And when Sergeant Moody approaches him on the steps and says, “Are you Tedio Alameda? Stand up. You, man, get away from him. Let me see your identification card.” He doesn’t even say, “What’s this all about?” Even though—
DC: Object again, Your Honor. I believe this is not fair comment on the evidence. This is comment on his exercise of his right to remain silent.
TC: Your Honor, the witnesses testified in this court, without objection, to that specific fact.
MJ: With regard to he did not ask what was going on?
TC: That’s right.
MJ: Okay. Now we’ve got that. We know that is in evidence. Now with regard—nothing will be held against this accused because he did not say anything in his defense. Okay? So let’s keep this very clear.
Regarding the items found in the dormitory bathroom, trial counsel argued that they showed a premeditated intent to kill. Trial counsel further argued that appellant sat in the chaplain’s office and thought to himself: “I’m leaving here and I’m going to go take that whore out. And I’ve got the implements in my car. I’ve got the box of bags. I’ve got the rubber gloves. I’ve got the knife. I’ve got the tape.” Trial counsel continued his argument:
Who knows what sinister plan he had in mind? That he was going to subdue her with the bag? Gag her and bind her' with the tape? Cut her wrists? Cut her throat? Keep the blood off his hands? And then when he fails, when he fails because she’s smart enough to get the door between them and she gets out the window, he gets out of that house. And he *197 runs down, he gets in his van where he’s got it parked with the door facing the hill, so all he has to do is hop in, and he goes back to the dormitory very quickly, and he says, “Jeez [sic], I better get rid of all these things that are involved in this.” And he runs upstairs and he throws the box of bags in the trash in the common area bathroom, and the rest of the implements, too. The rest of the new implements bought on the 16th of May, three days before. Premeditation.
Same place. Same time. Same condition. Consciousness of guilt. Proof of premeditated design to kill. And intent to kill. Is there any other intent here that is even reasonably inferable? Putting a bag over somebody’s head right before they get off the island? Was he just going over for one more exercise at control? One more exercise of dominance? I just want to get one last lick in before you go?
Or was he instead going over there to keep her from going? Perhaps to put her body in different bags, throw her in the bay, pick up his boy at day care, and claim he didn’t know anything about it.
The evidence is overwhelming. Attempted premeditated murder. Intent to kill. Not just a credibility contest.
After deliberating for approximately eight hours over a two-day period, the court members convicted appellant as charged.
The Court of Criminal Appeals held that the military judge erred by admitting the utility knife, masking tape, and gloves because they were not sufficiently connected to appellant. The court below held, however, that the error was harmless. The Government does not contest that holding. The court below did not address the admissibility of the testimony about appellant’s silence at the time of his apprehension, or the trial counsel’s argument that the silence was indicative of a consciousness of guilt.

Discussion

Appellant now asserts that his right to remain silent under the Fifth Amendment and Article 31 was violated when the trial counsel elicited testimony from TSgt Moody about his post-apprehension silence, and then argued that this silence reflected appellant’s consciousness of guilt. Appellant further asserts that the military judge exacerbated the error when he advised the members that appellant had no obligation to testify at trial, but did not advise them that he had the right to remain silent when he was apprehended. Reply Brief on Behalf of Appellant at 9. The Government does not concede error, but argues that the issue was not preserved by a timely and specific objection, and that any eiTor was harmless beyond a reasonable doubt. Final Brief on Behalf of the United States at 9-10.

Waiver

Mil.R.Evid. 103(a), Manual for Courts-Martial, United States (2000 ed.),[2] provides that error “may not be predicated” on a ruling admitting evidence “unless the ruling materially prejudices a substantial right of a party,” and there was a timely and specific objection. Mil.R.Evid. 103(d) sets out the plain error exception: “Nothing in this rule precludes taking notice of plain errors that materially prejudice substantial rights although they were not brought to the attention of the military judge.”
When trial counsel first elicited the testimony from TSgt Moody, it was not apparent that he intended to argue later that appellant’s silence showed consciousness of guilt. The military judge summarily overruled defense counsel’s relevance objection, without allowing either side to articulate reasons for or against admitting the testimony, and without articulating any rationale for admitting the evidence. If the military judge had required trial counsel to proffer a theory of relevance, the possible implication of the Fifth Amendment might have been apparent much earlier in the trial. We hold that defense counsel’s objection challenging the relevance of TSgt Moody’s testimony was sufficient to preserve the issue of the admis *198 sibility of that testimony in light of Mil. R.Evid. 304(h)(3). We further hold that defense counsel’s timely objection to trial counsel’s argument was sufficient to preserve the constitutional and statutory issues arising from trial counsel’s use of the evidence as substantive proof of guilt.

Relevance

Paragraph 140a(4) of the Manual for Courts-Martial, United States, 1969 (Rev. ed.), specifically recognized admissions by silence. It provided:
If an imputation against a person comes to his attention under circumstances that would reasonably call for a denial by him of the accuracy of the imputation if the imputation was not true, a failure on his part to utter such a denial will support an inference that he thereby admitted the truth of the imputation.
This provision has since been deleted, but “admissions by silence continue to be recognized in both military and civilian federal practice.” United States v. Cook, 48 MJ 236, 240 (1998); see also United States v. Stanley, 21 MJ 249, 250 (CMA 1986)(silence considered an admission “under certain circumstances”).
Mil.R.Evid. 304(h)(3) states when the inference may not be drawn. It provides:
A person’s failure to deny an accusation of wrongdoing concerning an offense for which at the time of the alleged failure the person was under official investigation or was in confinement, arrest, or custody does not support an inference of an admission of the truth of the accusation.
See United States v. Colcol, 16 MJ 479, 484 n. 4 (CMA 1983) (prearrest silence usually inadmissible and not an act from which guilt can be inferred).
We review a military judge’s decision to admit evidence for abuse of discretion. If the military judge makes findings of fact, we review the findings under a clearly-erroneous standard of review. We review conclusions of law de novo. United States v. Sullivan, 42 MJ 360, 363 (1995).
In this case, the military judge made no findings of fact or explicit conclusions of law. Thus, we review his application of the law de novo.
TSgt Moody advised appellant that he was being apprehended for an “alleged assault.” Appellant had a history of domestic violence, had been accused of assaulting his wife less that two weeks earlier, and had been ordered to stay away from her because of the incident. Under these circumstances, his failure to deny one more allegation of “alleged assault” does not support an inference of guilt. Thus, we conclude that appellant’s lack of response was not relevant.
Finally, even if appellant’s silence constituted an admission, it would admit only an “alleged assault,” not attempted premeditated murder. We hold that the military judge erred by admitting the evidence of appellant’s silence as substantive evidence of guilt.

Closing Argument

The privilege against self-incrimination recognized in Article 31(a), supra, is virtually identical to the privilege under the Fifth Amendment. Thus, our Fifth Amendment analysis also applies to Article 31(a).
In closing argument, the trial counsel was permitted to argue, over defense objection, that appellant’s lack of response when he was apprehended for an “alleged assault” reflected his consciousness of guilt of premeditated murder. Issues involving argument referring to unlawful subject matter are reviewed de novo as issues of law. See 2 Steven Childress & Martha Davis, Federal Standards of Review, § 11.23 (3d ed.1999).
The federal circuits distinguish between pre-arrest and post-arrest silence. They are divided on the question whether the prosecution may argue that pre-arrest silence is evidence of guilt. However, the First, Sixth, Seventh, and Tenth Circuits, constituting a majority of the circuits that have addressed the issue, have held that use of pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment. These circuits maintain “that application of the privilege is not limited to persons in custody or charged with a crime; it may also be asserted by a suspect who is questioned during the investigation of a crime.” Coppola v. Powell, 878 *199 F.2d 1562, 1565 (1st Cir.1989); see Combs v. Coyle, 205 F.3d 269, 282-83 (6th Cir.2000)(citing Coppola, supra); United States v. Burson, 952 F.2d 1196, 1201 (10th Cir.1991); United States ex rel. Savory v. Lane, 832 F.2d 1011, 1017 (7th Cir.1987) (summarizing the split in the federal circuits and holding that comment on pre-arrest silence violates Fifth Amendment).
The Ninth Circuit has held that use of post-arrest, pre-Miranda[3] silence as substantive evidence of guilt violates the Fifth Amendment. United States v. Velarde-Gomez, 269 F.3d 1023, 1028 (9th Cir.2001). A lack of response or reaction to an accusation is not “demeanor” evidence, but a failure to speak. Id. at 1031.
Mil.R.Evid. 304(h)(3) makes no distinction between pre-arrest and post-arrest silence. It applies to any person who “was under official investigation or was in confinement, arrest, or custody.”
This case involves post-apprehension,[4] preMiranda silence. We conclude, based on the language of Mil.R.Evid. 304(h)(3) and what we perceive to be the weight of authority in the federal circuits, that the military judge committed constitutional error by permitting the prosecution to introduce evidence of appellant’s post-apprehension silence as substantive evidence of guilt, and to then comment on that evidence in closing argument.

Curative Instructions

When a military judge instructs the members, the question whether the content of the instruction is legally correct is reviewed de novo. See United States v. Quintanilla, 56 MJ 37, 83 (2001).
When defense counsel objected to trial counsel’s argument that appellant’s silence showed a consciousness of guilt, the military judge instructed the members that appellant had “no obligation to make any statement during the trial in his defense.” (Emphasis added.) When defense counsel objected again, the military judge instructed the members that “nothing will be held against this accused because he did not say anything in his defense.” In our view, these instructions were off the mark because they did not address the question whether any adverse inference could be drawn from appellant’s silence at the time of his apprehension.
Instead of curing the error, the instructions may have exacerbated it. The instructions focused only on trial testimony and failed to address appellant’s pretrial silence. This omission may have led the members to conclude that, while no adverse inference could be drawn from appellant’s failure to testify at trial, the members were permitted to draw an adverse inference from appellant’s silence at the time of his apprehension. Accordingly, we conclude that the military judge’s instruction did not cure the error and may have exacerbated it.

Harmless Error

This Court reviews de novo whether an error was harmless. United States v. Grijalva, 55 MJ 223, 228 (2001). We consider the four following factors to evaluate prejudice from erroneous evidentiary rulings: “(1) the strength of the Government’s case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question.” United States v. Kerr, 51 MJ 401, 405 (1999)(citing United States v. Weeks, 20 MJ 22, 25 (CMA 1985)). We will apply these factors to analyze the cumulative impact of the erroneous admission of the masking tape, latex gloves, and utility knife, as well as the erroneous admission of testimony about appellant’s pretrial silence as substantive evidence of guilt.
To analyze the impact of trial counsel’s impermissible comment on appellant’s silence, we must first determine whether this error is of constitutional magnitude. For constitutional error, we must be satisfied beyond a reasonable doubt that the error was *200 harmless. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). For non-constitutional error, we must be satisfied that “the judgment was not substantially swayed by the error.” Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). If we are not satisfied, or if we are “left in grave doubt, the conviction cannot stand.” Id.
The Supreme Court has drawn a distinction between direct review and collateral review in determining if impermissible comment on pretrial silence was harmless. The Supreme Court has applied the Chapman standard to direct review, and the less onerous Kotteakos standard to collateral review. Brecht v. Abrahamson, 507 U.S. 619, 634-38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Because this case is on direct review, we apply the Chapman standard.
Applying the four-pronged Weeks factors, we are satisfied beyond a reasonable doubt that the errors were harmless with respect to the two offenses on April 30. Neither the irrelevant evidence nor the inadmissible evidence of appellant’s silence pertained to these offenses.
We are likewise satisfied beyond a reasonable doubt with respect to appellant’s conviction of violating the “stay away” order on May 19. Mrs. Alameda’s testimony was corroborated by the witnesses who observed the scratches on her nose and abrasions on her neck, the witnesses who observed appellant’s ear parked near the residence, TSgt Moody’s description of the open bedroom window with the blinds hanging out, and the testimony of lLt Haussler and Melanie Young about Mrs. Alameda’s demeanor immediately after her confrontation with appellant.
However, we are not persuaded beyond a reasonable doubt that the errors were harmless with respect the court members’ finding that appellant acted with a premeditated design to kill Mrs. Alameda. At trial, the military judge correctly instructed the members that the elements of attempted premeditated murder were:
(1) That at or near Kadena Air Base, Okinawa, Japan, on or about 19 May 1998, the accused did certain acts, that is: attempt to murder Marla D. Alameda by means of suffocating and choking her with his hands and a plastic bag;
(2) That such acts were done with the specific intent to kill Marla D. Alameda; that is, to kill without justification or excuse;
(3) That such acts amount to more that mere preparation; that is, they were a substantial step and a direct movement toward the unlawful killing of Marla D. Alameda;
(4) That such acts apparently tended to bring about the commission of the offense of premeditated murder; that is, the acts apparently would have resulted in the actual commission of the offense of premeditated murder except for an unexpected intervening circumstance which prevented completion of that offense; and
(5) That at the time the accused committed the acts alleged, he had the premeditated design to kill Marla D. Alameda.
See Paragraphs 4b and 43b(l), Part IV, Manual, supra. He also instructed them on the elements of the following lesser-included offenses: attempted unpremeditated murder, attempted voluntary manslaughter, aggravated assault, and assault consummated by a battery. See Paragraphs 43b(2), 44b(l), 54b(4)(a), and 54b(2), Part TV, Manual, supra, respectively.
At trial, the prosecution’s proof of the elements of premeditation and intent to kill consisted of the following:
(1) Mrs. Alameda’s testimony that appellant removed an unused garbage bag from his pocket and attempted to place it over her head;
(2) the unopened roll of masking tape, a utility knife in its original package, and an unopened package of latex gloves, found in a common dormitory bathroom;
(3) a box of Hefty garbage bags with one bag removed and appellant’s fingerprints on the box; and
(4) TSgt Moody’s testimony regarding appellant’s silence at the time of his apprehension.
*201 The court below held that the masking tape, utility knife, and latex gloves were not sufficiently connected to appellant to be relevant. The Government has not contested that holding, and we are satisfied that it is not “clearly erroneous,” nor would it “ ‘work a manifest injustice’ if the parties were bound by it.” Accordingly, it is the law of the case. United States v. Doss, 57 MJ at 188 n. * (2002)(citing Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)).
In light of our holding that appellant’s silence was not admissible proof of the substantive offense, the only remaining proof of appellant’s premeditated attempt to kill was the box of Hefty garbage bags bearing appellant’s fingerprints, Mrs. Alameda’s testimony that appellant tried to put a Hefty garbage bag over her head, and the abrasions on Mrs. Alameda’s neck.
Mrs. Alameda’s testimony was not entirely consistent with an attempted premeditated murder. She testified that she became hysterical when appellant came to the house, and that he then sat down on a couch and wanted to talk. Mrs. Alameda testified that he tried to calm her down. She also testified that after she ran into the bedroom and told appellant that she would talk to him, he stopped moving toward her and began walking toward the living room, thereby allowing her to escape through the bedroom window.
Likewise, the only remaining admissible evidence of intent to kill was the same box of Hefty garbage bags bearing appellant’s fingerprints, the abrasions on Mrs. Alameda’s neck, and her testimony. Her testimony included both a statement that appellant sought to strangle or suffocate her with a garbage bag, as well as a statement that appellant subsequently agreed to return to the living room to talk, at which time she made good her escape.
After considering the admissible evidence of premeditation and intent to kill, we are not satisfied beyond a reasonable doubt that the members would have convicted appellant of attempted premeditated murder, the lesser-included offenses of attempted unpremeditated murder or attempted voluntary manslaughter, without (1) the testimony about appellant’s silence, (2) the masking tape, the latex gloves, and the utility knife, (3) the improper comment of trial counsel on appellant’s silence, and (4) the instruction of the military judge that may have exacerbated the impact of trial counsel’s argument. Accordingly, we must reverse the lower court’s decision with respect to Charge I and its specification, alleging attempted premeditated murder.
The court below concluded that admission of irrelevant evidence (the masking tape, latex gloves, and utility knife) was harmless beyond a reasonable doubt with respect to the charge of attempted premeditated murder. However, that court has not considered whether the cumulative effect of that error, combined with the errors of constitutional magnitude found by this Court, were harmless beyond a reasonable doubt with respect to the lesser-included offenses of aggravated assault or assault consummated by a battery. Accordingly, we conclude that a remand for further review under Article 66(c), UCMJ, 10 USC § 866(c), is appropriate.

Decision

The decision of the United States Air Force Court of Criminal Appeals is reversed with respect to Charge I and its specification and as to the sentence. In all other respects, the decision below is affirmed. The findings of guilty of Charge I and its specification and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Air Force for remand to the Court of Criminal Appeals. That court will review the record to determine if the errors were harmless beyond a reasonable doubt with respect to the lesser-included offenses that do not contain elements of premeditation or intent to kill, i.e., aggravated assault and assault consummated by a battery; and whether the remaining evidence is factually and legally sufficient to support a conviction of aggravated assault or assault consummated by a battery. The court may reassess the sentence or order a sentence rehearing. As an alternative to further review of the record with respect to the lesser-included offenses of Charge I and its specification, the court *202 may order a rehearing on the charge of attempted premeditated murder and the sentence. Thereafter, Article 67, UCMJ, 10 USC § 867, will apply.

. We heard oral argument in this case at the Seattle University School of Law, Seattle, WA, as part o£ the Court’s "Project Outreach.” See United States v. Pritchard, 45 MJ 126, 127 n. 1 (1996). The granted issues are:
1. WHETHER THE FINDINGS AND SENTENCE SHOULD BE SET ASIDE BECAUSE APPELLANT’S RIGHT TO REMAIN SILENT UNDER THE FIFTH AMENDMENT WAS VIOLATED WHEN THE PROSECUTION ELICITED TESTIMONY THAT APPELLANT DID NOT RESPOND VERBALLY WHEN ARRESTED, AND WHEN THE PROSECUTION COMMENTED ON THIS DURING FINAL ARGUMENT.
II. WHETHER THE FINDINGS AND SENTENCE SHOULD BE SET ASIDE BECAUSE APPELLANT’S RIGHT TO REMAIN SILENT UNDER ARTICLE 31(b), UCMJ, WAS VIOLATED WHEN THE PROSECUTION ELICITED TESTIMONY THAT APPELLANT DID NOT RESPOND VERBALLY WHEN ARRESTED, AND WHEN THE PROSECUTION COMMENTED ON THIS DURING FINAL ARGUMENT.

. All Manual provisions cited are identical to the ones in effect at the time of appellant’s court-martial.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Military cases use the term "apprehension” to mean the same thing as "arrest” in civilian cases. This difference in terminology is based on the definitions of "apprehension” and “arrest" in Articles 7 and 9, Uniform Code of Military Justice 10 USC §§ 807 and 809, respectively.