# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
WOLFE, SALUSSOLIA, and SCHASBERGER
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Master Sergeant OMAR A. VELEZ-PAGAN**
**United States Army, Appellant**

ARMY 20160209

Headquarters, Fort Bragg
Christopher T. Fredrikson, Military Judge
Colonel Michael O. Lacey, Staff Judge Advocate (pretrial)
Lieutenant Colonel William E. Mullee, Staff Judge Advocate (post-trial)

For Appellant:  Captain Matthew D. Bernstein, JA; William E. Cassara, Esquire (on brief); Captain Augustus Turner, JA; William E. Cassara, Esquire (on reply brief).

For Appellee:  Lieutenant Colonel Eric K. Stafford, JA; Major Cormac M. Smith, JA; Captain Jeremy Watford, JA (on brief).

30 August 2018

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

SCHASBERGER, Judge:

Master Sergeant Omar A. Velez-Pagan appeals his convictions for murder and assault.  Appellant alleges that errors of trial counsel and the military judge denied him a fair trial and the government did not meet its burden of proof.  We disagree. We find the military judge's denial of appellant's request for a mistrial was not error.  The trial counsel's argument was not improper, and even if it was, the instructions by the military judge ensured appellant was not prejudiced.  Finally, appellant's convictions are legally and factually sufficient.

A military judge sitting as a general court-martial convicted appellant, pursuant to his pleas, of possessing and using a controlled substance, adultery, and obstructing justice, in violation of Articles 112a, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 912a, and 934.  An officer panel sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of

unpremeditated murder, and one specification of assault, in violation of Articles 118, and 128, UCMJ. The panel sentenced appellant to a dishonorable discharge, confinement for thirty years, forfeiture of all pay and allowances, and a reduction to the grade of E-1. The military judge credited appellant with 828 days toward his sentence to confinement for pretrial confinement and unlawful pre-trial punishment. The convening authority approved the adjudged sentence.

This case is before us under Article 66, UCMJ. Appellant raises five assignments of error, two of which merit discussion but no relief.[1] We also considered the matters personally asserted by appellant under *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982); they merit neither discussion nor relief.[2]

---

[1] Appellant's other three assignments of error are:

First, appellant argues the military judge abused his discretion by precluding the defense from introducing a "prior consistent statement" of appellant. We disagree. The military judge correctly ruled the statement—made by appellant to his defense counsel—did not fit under the prior consistent statement rule and was inadmissible.

Next, appellant argues he is entitled to a new trial because the special court-martial convening authority (SPCMCA) was disqualified and failed to inform the general court-martial convening authority (GCMCA) of his disqualification. We disagree. At trial, appellant intentionally chose to proceed with arraignment without moving for relief, stating that, if the error was jurisdictional, the error could not be waived. The error, however, is not jurisdictional. Any objection, therefore, was waived. Further, we are persuaded, given the gravamen of the charges, the recommendation of the SPCMCA was not influential in the GCMCA's decision to refer the charges to a general court-martial.

Finally, appellant argues the military magistrate abused her discretion by placing appellant in pretrial confinement and the military judge erred by considering evidence outside of what the military magistrate considered when he continued the confinement. We find no abuse of discretion by the military magistrate.

[2] As part of his unsworn submission pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), appellant personally asserts, *inter alia*, his defense counsel were ineffective because his defense counsel did not object to evidence about appellant's adultery. Upon review of the entire record, we disagree with appellant's assertion. We see no need to order affidavits from counsel or a hearing under *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967). It is clear from the record the evidence was admissible and objection would serve no tactical purpose. We have considered appellant's full submission under *Grostefon* and find it merits no relief.

## BACKGROUND

In early 2014, appellant served on a training team operating out of the U.S. Embassy in Panama. Appellant had several adulterous relationships while in Panama, including one with Ms. Rodriguez-Chavarria. Appellant's wife knew of some of his affairs but not the one with Ms. Rodriguez-Chavarria. During the affair, Ms. Rodriguez-Chavarria would continually ask appellant for money, and on 19 June 2014 threated to call his wife. Appellant's response was to tell Ms. Rodriguez-Chavarria "don't do anything crazy." Appellant introduced Ms. Rodriguez-Chavarria to his U.S. and Panamanian co-workers; they knew her as "La Chiricana."[3]

One of appellant's missions was to train the Panamanian Police (PNP). In June of 2014, appellant and other team members went to Las Tablas, Panama, to conduct marksmanship training with a PNP unit. Appellant and Sergeant First Class (SFC) Esteras-Palos, another trainer at the Embassy, stayed in a local hotel for the training. Appellant had the use of a pickup truck, a Toyota Hilux, to perform his job.

On Sunday, 22 June 2014, appellant, SFC Esteras-Palos and several PNP instructors went to the beach on their day off. Ms. Rodriguez-Chavarria joined appellant for the day at the beach. She drank whisky and became increasingly intoxicated and obnoxious as the day progressed.

In the evening, the group decided to head back to the hotel and watch the U.S. versus Portugal soccer game. Appellant and Ms. Rodriguez-Chavarria got in the Hilux, alone, and began arguing. Afraid Ms. Rodriguez-Chavarria would make a scene, appellant decided not to watch the game but instead would drive somewhere else.

Appellant drove while he and Ms. Rodriguez-Chavarria continued to argue. Appellant drove past a town and continued through an undeveloped and relatively uninhabited part of Panama. Appellant pulled onto a paved trail and stopped the truck. The argument turned physical when appellant punched Ms. Rodriguez-Chavarria in the face, causing her to have black eyes and a split lip.[4]

---

[3] More or less meaning "the woman from Chiriquí," a province in Panama.

[4] Appellant claims Ms. Rodriguez-Chavarria struck him in the face and the force of the blow caused him to bite his own lip. Appellant did not appear to have any injuries except for on his right hand, which was injured striking at Ms. Rodriguez-Chavarria. Ms. Rodriguez-Chavarria's fingernails were not broken and did not have any DNA or skin of appellant on them.

Appellant offered several different versions of what happened next.[5] The evidence, however, shows Ms. Rodriguez-Chavarria lost consciousness and appellant drove over her body with the truck.

Ms. Rodriguez-Chavarria died as a result of a brain stem injury when the Toyota Hilux drove over her head. Her other injuries included a broken nose and jaw, and injuries to her thorax, pelvis, abdomen, and legs. Her injuries were not consistent with jumping out of a moving vehicle or being knocked to the ground by a moving vehicle.

Appellant collected Ms. Rodriguez-Chavarria's body and placed her in the vehicle. Appellant drove to the PNP training area and parked on a trail leading into the woods. He carried Ms. Rodriguez-Chavarria's body into the woods and left her. Appellant removed the battery of her cell phone. As he was backing away, he hit a tree damaging the truck and breaking a taillight. Appellant returned to the hotel and jumped into the pool wearing his clothes.

Early the next morning, appellant drove to the training area and covered Ms. Rodriguez-Chavarria with branches. As he departed, a PNP trainer saw him and asked why he was there. Appellant told him he was doing physical training.

Appellant purchased carpet cleaner and tried to clean the blood stains in the truck. He bought ten pounds of lime from a local hardware store. Appellant went to the police station and asked for a shovel and pick axe. They lent him a shovel but did not have a pick axe, so appellant returned to the hardware store and bought one.

Appellant next drove back to the training area, where SFC Esteras-Palos and the PNP had begun training. He parked away from the other vehicles, near the entrance to the trail where he left Ms. Rodriguez-Chavarria's corpse. He told the officers he was not feeling well. As there were no latrines at the training area, people used the woods to take care of their personal needs. Appellant took his tools into the woods and dug a hole near Ms. Rodriguez-Chavarria's body. While digging, he went back to his truck to take a break, leaving his tools near the hole and corpse.

Officer Gonzalez needed to relieve himself. He went to appellant's truck to get toilet paper. After entering the woods, he saw the tools, hole, and dead body. He drew his weapon and rushed back, yelling for back up. He aimed his weapon at appellant and told him to come with him. Appellant told him to calm down, and admitted he had killed "La Chiricana." Lieutenant Acuna-Maure of the PNP rushed over to assist Officer Gonzalez, and appellant told him "I killed her. I killed her." Lieutenant Reyes-Alarcon of the PNP also heard appellant say he killed her.

---

[5] Appellant's inconsistent versions of events are a central feature of the case.

4

The PNP discussed who should arrest appellant and what to do. The other U.S. Soldier, SFC Esteras-Palos took appellant's uniform jacket and went to place it in the truck, where he noticed a foul smell and blood. When SFC Esteras-Palos heard appellant say he killed "La Chiricana," SFC Esteras-Palos told him to be quiet.

At the police station, appellant continued to make statements about killing Ms. Rodriguez-Chavarria. By telephone, appellant told his commander, Lieutenant Commander (LCDR) Ojeda, Ms. Rodriguez-Chavarria hit him and caused him to crash the truck. Appellant told his commander, he hit Ms. Rodriguez-Chavarria in the face, she never regained consciousness, and she "stopped breathing."

Appellant told SFC Esteras-Palos another version of events, in which, Ms. Rodriguez-Chavarria pulled on the steering wheel, causing the vehicle to roll off the road. In this alternate version of events, after appellant hit Ms. Rodriguez-Chavarria, she jumped out of the truck and appellant hit his hand on the truck frame attempting to hit her again. Contrary to the story he told LCDR Ojeda, appellant told SFC Esteras-Palos he got out of the truck, went around the vehicle, saw the rear wheels roll over Ms. Rodriguez-Chavarria, ran to get back in the cab, but felt the front wheels also roll over her before he could stop the truck. Appellant also told SFC Estras Palos, "[Ms. Rodriguez-Chavarria] was blackmailing me. She was threatening to tell my wife about our relationship. She was going to bring it to the embassy. She was going to ruin my career."

The PNP conducted an initial investigation of the death. The medical examiner's conclusion was that Ms. Rodriguez-Chavarria was struck with a fist one or two times in the face. The rest of her injuries were attributable to being run over by two separate tires. One which traversed her head and one which traversed her pelvis and leg. The cause of death was the head injury.

At trial, appellant testified he committed adultery with several women and his wife was aware of his infidelities. His testimony confirmed what happened at the beach, his jumping into the pool, buying lime and a pick axe, borrowing a shovel, and his various statements to the PNP. Appellant admitted to punching Ms. Rodriguez-Chavarria in the face. Appellant testified that after he punched Ms. Rodriguez-Chavarria in the face she calmed down and they both sat in the truck. He then began driving slowly looking for a place to turn around, the next thing he heard was the cab door closing as Ms. Rodriguez-Chavarria exited the cab. He then jumped out of the truck, took several steps, realized the truck was rolling backward and, before he could stop the vehicle, both wheels rolled over Ms. Rodriguez-Chavarria.

Appellant testified he placed Ms. Rodriguez-Chavarria in the front seat to drive her to a hospital, but realizing she was dead, he moved her to the floor in the back of the cab. Appellant then drove to the training area and dumped her body.

The defense introduced a video showing the road where appellant testified Ms. Rodriguez-Chavarria died.

As part of his direct examination, appellant acknowledged he lied to LCDR Ojeda, lied to SFC Esteras-Palos, and lied to various members of the PNP. On cross-examination, the appellant admitted he lied to various other people, including his wife. Appellant nevertheless called several witnesses to testify he had a character for truthfulness.

In closing argument, the government argued appellant's initial statements that he killed Ms. Rodriguez-Chavarria were accurate, and he subsequently invented new versions, including his testimony in court, in an attempt to cover-up his crime. Appellant did not object during the government's closing argument. In closing, the defense argued Ms. Rodriguez-Chavarria's death was a tragic accident that caused appellant to panic and make bad decisions. The defense argued: "[Appellant] took the stand and told you exactly what happened." The defense continued: *And he is the only one who knows what happened there*." (emphasis added).

During the government's rebuttal, the trial counsel argued: "[Appellant's] story is supported by one thing. The [appellant's] self-serving statements. You saw it, a scripted performance."[6] Trial counsel also argued in rebuttal: "The location. The defense makes a big deal out of the fact that we never found the location. You know why we never found the location. There's only two people who knew where that location was and one of them is dead." The defense counsel objected on the basis it was improper commentary on the accused's invocation of his Fifth Amendment rights. The military judge sustained the objection and instructed the panel to disregard the comment made by counsel. Appellant moved for a mistrial, which the military judge denied.

To address appellant's objection to the government's argument, the military judge held a hearing outside the presence of the members. The military judge sustained appellant's objection to the statement, "[t]here's only two people who knew where that location was and one of them is dead." After discussing remedies for that statement, the military judge asked defense counsel whether the trial counsel had also stated, "the defense rather than the accused had plenty of time to put on a scripted performance." The defense counsel said he thought the trial counsel said both appellant and his defense team had "scripted" appellant's testimony. Based on defense counsel's recollection of the government's argument, the military judge asked the defense what remedy it sought. The defense counsel asked for additional curative instructions and the government's argument be curtailed.

---

[6] The trial counsel characterized appellant's testimony as "scripted" six times in his rebuttal argument. Appellant did not object to this argument when it was made.

6

The military judge agreed to give an additional curative instruction. When the panel was recalled, he told them, "I instructed you that the trial counsel had made an improper argument. I will instruct you that you must completely disregard that argument." The panel members agreed to follow that instruction. The military judge also gave the following instruction: "Members, defense counsel have an ethical obligation not to knowingly elicit false testimony; therefore, any comment by the trial counsel that the defense scripted the accused's testimony was improper and must be completely disregarded by you. Can each of you comply with that instruction?"[7] All members answered affirmatively. The military judge directed the trial counsel to "wrap up" his rebuttal argument in "two sentences."

## LAW AND DISCUSSION

### A. Denial of the Motion for Mistrial

We review a military judge's ruling on a motion for mistrial for abuse of discretion. Appellate military courts, "will not reverse a military judge's determination on a mistrial absent clear evidence of an abuse of discretion." *United States v. McFadden*, 74 M.J. 87, 90 (C.A.A.F. 2015) (quoting *United States v. Ashby*, 68 M.J. 108, 122 (C.A.A.F. 2009)) (citations omitted). "A curative instruction is preferred to granting a mistrial, which should only be granted 'when inadmissible matters so prejudicial that a curative instruction would be inadequate are brought to the attention of the members.'" *Id.* at 89-90 (quoting *United States v. Diaz*, 59 M.J. 79, 92 (C.A.A.F. 2003)) (citations omitted).

We therefore must decide: Were inadmissible matters brought to the attention of the members? If so, were they so prejudicial the curative instructions were inadequate? As discussed below, we answer both questions in the negative.

### 1. Was Government Counsel's Argument Improper?

The military judge found it was improper for the trial counsel to argue, "[t]here's only two people who know where that location was and one of them is dead." The military judge also found it was improper for the trial counsel to repeatedly argue appellant's testimony was "scripted." The military judge found the first statement was an improper reference to the appellant's right to remain silent and the second impugned the ethics of the defense team. We address each in turn.

It is unjust to argue any negative inference should be drawn from the invocation of an individual's constitutional rights. "Whether there has been

---

[7] The defense provided the wording of the additional instruction, and the military judge added the word "knowingly."

improper reference to an accused's invocation of his constitutional rights is a question of law that we review de novo." *United States v. Moran*, 65 M.J. 178, 181 (C.A.A.F. 2007) (citing *United States v. Alameda*, 57 M.J. 190, 198 (C.A.A.F. 2002)). As our predecessor court held in *United States v. Carr*, "it is inappropriate that any party to a court-martial should be allowed to profit, directly or indirectly, by argument on findings or sentence regarding an exercise of a constitutionally protected criminal due process right." 25 M.J. 637, 639 (A.C.M.R. 1987).

Though precluded from commenting on a protected right, the government is allowed to make "a fair response" to statements made by the defense. This is true even when a constitutional right is implicated. *United States v. Robinson* 485 U.S. 25, 32-33 (1988). To determine whether or not comments are fair, they must be examined in context. *United States v. Lewis*, 69 M.J. 379, 384 (C.A.A.F. 2011) (citations omitted).

At first glance, the statement "only two people know where the location was and one is dead" might appear to be a textbook example of commenting on an accused's right to remain silent. Appellant, however, did not remain silent. Appellant made statements starting the first moment he was caught with Ms. Rodriguez-Chavarria's corpse.[8] He continued making statements after being cautioned to keep silent, and he testified in his own defense at trial. Further, defense counsel stated in his closing argument "[Appellant] took the stand and told you exactly what happened. And he is the only one who knows what happened there." The government's comment was on appellant's testimony and defense's argument, not on appellant's right to be silent. In this context, the government's argument was not improper. It was a fair response to appellant's various statements and defense counsel's argument.

We next turn to whether it was impermissible for the government to describe appellant's testimony as "scripted." We conclude it was not under the facts of this case. The government's argument was a fair response to defense counsel's argument.

The military judge stated "I hope I misheard it. But I think I heard [trial counsel] say the defense rather than the accused had plenty of time to put on a scripted performance." He then asked the defense counsel, who replied he also believed the trial counsel accused both counsel and the accused of a scripted performance. Our review of the record, however, shows the government counsel

---

[8] For example: "I killed her." "[S]he was blackmailing me." "[I] punched her in the face, and she never came to."

never directly accused the defense counsel of scripting the words of appellant.[9] Rather, the government's accusation was simply that appellant gave a scripted performance.

As a general rule, disparaging an accused "is a 'dangerous practice that should be avoided.'" *United States v. Fletcher* 62 M.J. 175, 182 (C.A.A.F. 2005) (qouting *United States v. Clifton*, 15 M.J. 26, 30 n.5 (C.M.A. 1983)). In *Fletcher*, our superior court found calling the accused a liar was improper argument. *Id.* This case is distinguishable, however, as the defense counsel opened the door when they first elicited testimony appellant lied repeatedly, and then argued, "[o]ne thing the government's evidence did show . . . [appellant], is a terrible liar. He's a terrible liar."

The defense's theory was, essentially, appellant's prior lies were so *obviously* false that anything appellant says, which is not *obviously* false, must therefore be true. The government countered by asserting appellant had more time to perfect his story prior to trial, but he was no more candid at trial than when first caught. We find the government's argument was not outside the bounds of what is permissible.

### 2. *Was the Curative Instruction Inadequate?*

Even assuming, arguendo, trial counsel made improper arguments, we find the arguments did not materially prejudice appellant's substantial rights, and we are confident the members convicted appellant on the basis of the evidence alone. *See generally Fletcher*, 62 M.J. at 184.

First, even if we assume the government's argument was improper, it was not egregious. The military judge found both the statement "only two people know and one is dead," and the references to "scripted" performance error. Appellant argues the government's statements were akin to a bell that cannot be un-rung. In this case, however, the argument was more akin to the government re-ringing a bell the defense already rang louder.

Second, we find the military judge's curative measures were adequate. The military judge gave an instruction immediately, which ensured the panel members

---

[9] To be sure, the trial counsel walked a fine line, but in our view he did not stray over it. Appellant argues the obvious implication of the government's argument was that defense counsel scripted appellant's testimony. In the context of the government's whole argument, we do not find it so obvious. The government's theory was that appellant evolved his story to account for the evidence against him. The evolution of appellant's story began long before he had defense counsel. Thus, it is not obvious the government was accusing defense counsel of unethical behavior.

knew what part of the government's argument was improper. He then followed-up with a second instruction when the panel was recalled. The military judge ensured the panel members understood the instructions and agreed to follow them. Finally, the military judge curtailed the trial counsel's rebuttal argument.

Third, the overwhelming weight of the evidence supports a conviction. The government introduced ample evidence, including multiple admissions by appellant, blood splatters in the truck, and video of appellant buying lime and a pick axe. The uncontroverted medical examiner's testimony established the cause of death, and ruled out Ms. Rodriguez-Chavarria jumping from a moving vehicle or getting hit while standing.

Accordingly, we conclude appellant received a fair trial and the military judge did not abuse his discretion by denying the motion for mistrial.

### B. Factual Sufficiency

Appellant asserts the evidence is factually insufficient to prove, beyond a reasonable doubt, the death of Ms. Rodriguez-Chavarria was not an accident, within the meaning of R.C.M. 916(f), and he was not acting in self-defense when he hit Ms. Rodriguez-Chavarria's face with his hand.

We conduct a de novo review of factual sufficiency. *United States v. Washington,* 57 M.J. 394, 399 (C.A.A.F. 2002). The test is, "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are "convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

### 1. Appellant's Claim of Accident

"A death, injury, or other event which occurs as the unintentional and unexpected result of doing a lawful act in a lawful manner is an accident and is excusable." R.C.M. 916(f). In the context of driving a vehicle, "the evidence must show that 'the driver was driving carefully, lawfully, and without neglect.'" *United States v. Davis* 53 M.J. 202, 205 (C.A.A.F. 2000) (quoting *United States v. Curry*, 38 M.J. 77, 80 n.6 (C.M.A. 1993).

The defense of accident requires appellant must not have been negligent. *Curry*, 38 M.J. at 80. Negligence is "the absence of the degree of care for the safety of others which a reasonably careful person would have exercised under the same or similar circumstances." *United States v. Gordon*, 31 M.J. 30, 34 (C.M.A. 1990) (citation, alterations, and internal quotation marks omitted).

10

Appellant's conviction of unpremeditated murder, under Article 118, UCMJ, required proof, beyond a reasonable doubt, appellant *intended* to kill Ms. Rodriguez-Chavarria or inflict grievous bodily harm upon her.[10] Appellant invites us to assess whether the defense of accident applies to his conviction of murder. Appellant's conviction, however, required proof of specific intent—a far-higher *mens rea* than negligence—and mere negligence renders the defense of accident inapplicable.

Our superior court has noted that, although found in the R.C.M. among "defenses," "accident is, in reality, merely the absence of *mens rea*." *Curry*, 38 M.J. at 80. If a crime requiring specific intent is proved beyond a reasonable doubt, the defense of accident has been disproved. Overwhelming evidence disproves appellant's defense of accident.[11] More to the point, the evidence proves, beyond a reasonable doubt, appellant intended to kill Ms. Rodriguez-Chavarria when he ran over her with the truck. Appellant's conviction for murder is legally and factually sufficient.

### b. Appellant's Claim of Self-Defense

To successfully meet the elements of self-defense, appellant must have both: "[1] Apprehended, upon reasonable grounds, that bodily harm was about to be inflicted wrongfully on [him];" and "[2] [b]elieved that the force that [he] used was necessary for protection against bodily harm . . . ." R.C.M. 916(e)(3).

"The first element . . . has an objective component, involving the perception of a reasonable person under the circumstances. The second element . . . is wholly subjective, involving the personal belief of the accused, even if not objectively reasonable." *United States v. Dobson*, 63 M.J. 1, 11 (C.A.A.F. 2006).

Appellant's claim of self-defense to striking Ms. Rodriguez-Chavarria with his hand is rooted in his testimony that she assaulted him first. When an accused testifies, he does so at his own peril. "[A] statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt." *United States v. Pleasant*, 71 M.J. 709, 713 (Army Ct. Crim. App. 2012) (quoting *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995)). The panel did not have to "accept and believe the self-serving stories of [appellant]. [His] evidence may not only be disbelieved, but from the totality of the circumstances, including the manner in which [he testified], a contrary conclusion may be properly drawn." *Id*. at 714

---

[10] Article 118, UCMJ, defines three other kinds of murder, but this was the only theory of murder on which the military judge instructed the panel.

[11] Even under appellant's version of the facts, his claimed failure to put the vehicle in the proper gear and apply the parking break while on a hill would be negligent.

(quoting *United States v. Cisneros*, 448 F.2d 298, 305-06 (9th Cir. 1971). The panel was free to draw an adverse conclusion from appellant's testimony, and so are we.

Given appellant's differing versions of events, and how Ms. Rodriguez-Chavarria was killed, appellant's testimony is simply not credible, and it is not supported by the rest of the evidence in this case. Without any credible evidence appellant reasonably apprehended an assault by Ms. Rodriguez-Chavarria, we find, beyond a reasonable doubt, appellant did not apprehend any bodily harm. Thus, appellant's claim of self-defense fails.

Even if we had reasonable doubt as to whether appellant reasonably apprehended Ms. Rodriguez-Chavarria assaulting him, we also find, beyond a reasonable doubt, appellant did not subjectively believe his actions were necessary for his own protection. Appellant's overall course of conduct demonstrates his intent to harm Ms. Rodriguez-Chavarria, not to protect himself. Further, appellant was a large, muscular, trained warfighter. Ms. Rodriguez-Chavarria was a much smaller woman. The overwhelming force used by appellant was inconsistent with a subjective intent merely to defend himself.

## CONCLUSION

Upon consideration of the entire record, the findings and sentence are AFFIRMED.

Senior Judge WOLFE and Judge SALUSSOLIA concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court