UNITED STATES, Appellee

v.

James E. SPRINGER, Staff Sergeant
U.S. Air Force, Appellant

No. 02-0237

Crim. App. No. S29803

_____

United States Court of Appeals for the Armed Forces

Argued December 10, 2002

Decided March 21, 2003

BAKER, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., GIERKE, EFFRON, and ERDMANN, JJ., joined.


Counsel


For Appellant:  David E. Wheeler, Esq. (argued); Colonel
    Beverly B. Knott, Major Maria A. Fried, Major Terry L.
    McElyea, and Major Jeffrey A. Vires (on brief).

For Appellee:  Captain Steven R. Kaufman (argued);
    Lieutenant Colonel LeEllen Coacher, Lieutenant Colonel
    Lance B. Sigmon and Major Linette Romer (on brief);
    Colonel Anthony P. Dattilo.



Military Judge:  Kurt Schuman

THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION

Judge BAKER delivered the opinion of the Court.

Appellant was tried by a special court-martial. Contrary to his pleas, he was found guilty of two specifications under Article 92, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 892 (2002), for providing alcohol to a trainee and for making sexual advances toward a trainee. He was also convicted of two specifications of maltreatment under Article 93, UCMJ, 10 U.S.C. § 893 (2002), based on physical body searches that he performed on female trainees. The adjudged and approved sentence was a bad-conduct discharge and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence. United States v. Springer, ACM S29803 (A.F. Ct. Crim. App. Oct. 25, 2001).

We granted review on the following issues:

I

WHETHER THE MILITARY JUDGE ERRED WHEN HE DENIED APPELLANT'S MOTION TO SUPPRESS INFORMATION UNLAWFULLY OBTAINED WHEN APPELLANT'S SEALED LETTER WAS REMOVED FROM A DESIGNATED PLACE FOR OUTGOING MAIL AND ITS CONTENTS EXAMINED.

II

WHETHER CHARGE II IS LEGALLY INSUFFICIENT BECAUSE APPELLANT'S CONDUCT DID NOT CONSTITUTE CRUELTY OR MALTREATMENT AS INTENDED BY ARTICLE 93.

For the reasons stated below we affirm.

2

## Issue I: Appellant's letter

### A.   Facts

Appellant was a Combat Skills Course instructor at Lackland Air Force Base (AFB) and at Camp Bullis, both in San Antonio, Texas.  Among other duties, Appellant served as a primary instructor for trainee squads attending the Security Officers Apprentice Course at Camp Bullis, a twenty-one day course of instruction in combat arms for military policemen.  Camp Bullis is an "austere" Army post located 16-18 miles north of Lackland AFB.  There were no formal mail facilities at Camp Bullis at the time of the events at issue.  As a result, trainees would leave their mail at a front office desk within the dormitory building where the military training leader collected it and delivered it to Lackland AFB.

Between the summer and November of 1998, Staff Sergeant (SSgt) Payne, a non-commissioned officer (NCO) assigned to the front office, noticed Appellant's name as the return addressee on a letter as he was flipping through the outgoing mail.  SSgt Payne testified that it was his practice to flip through the mail in the morning to ensure that students had placed postage and return addresses on outgoing mail.  He had no official duty to do so, but did so "out of kindness" to help the airmen and to prevent

their mail from being returned.  Specifically, SSgt Payne testified that he was

> [j]ust checking to make sure that the envelopes that were there had stamps and return addresses on there and placing them in the window . . . . [N]ormally students are rushed in the morning.  They are in a hurry to get out – get out to formation, otherwise, they get in trouble for being late to formation.  And a lot of times, they will just throw an envelope on there with nothing on it to mail it – just forgetting to put a stamp or forgetting to put an address on it . . . . [T]hat's when I saw Sergeant Springer's name on the envelope, and I thought that it was kind of peculiar . . . . I thought it was kind of peculiar for NCOs and instructors to be mailing something from the office . . . . [W]hen I saw it was his name, I looked at the student's name.  I recognized the student's name as being a previous student.  And then at that time, Sergeant Rodriguez walked in, and I said something to him.

SSgt Payne described his reaction as one of "shock and amusement because it was – it was the strict policy of the squadron and of [Air Education and Training Command] is absolutely no contact and absolutely no relations at all, and it was quite an amazing – you know, it was like, wow, this is kind of silly to be doing this."  Master Sergeant [MSgt] Daryl Leboeuf, Appellant's supervising Senior Staff NCO at Camp Bullis, stated:  "[I]ndividuals got briefed on personal relationship policy a minimum of once a month, sometimes more . . . . [T]here will be no personal relationships with the airmen.  Trainees are a non-issue. . . . Sergeant Springer was aware of that."

4

With respect to the contents of the letter, SSgt Payne testified that "once you turned the envelope over, you could see through the back of the envelope, and you could see a picture that was drawn." (Emphasis added.) SSgt Payne did not testify as to the nature of the "picture." However, Appellant's motion to suppress states that the picture depicted a heart with two extended arms saying, "I love you this much."

SSgts Payne and Rodriguez subsequently encountered SSgt Stephanie Schaaf and told her about the letter. She then went back to the dormitory and examined the letter in the same manner as SSgt Payne had done. When later questioned by Ms. Catherine Jeffryes, a Security Forces investigator, SSgt Schaaf told the investigator that she saw the words, "I love you BeBe" inside the letter and that it was written to a former trainee with a Hispanic last name. When Ms. Jeffryes interviewed Appellant and asked about the letter, he admitted to having written Airman First Class (A1C) Mendez (now Humphries). Ms. Jeffryes also testified that "but for" information from SSgt Schaaf, she would not have asked Appellant about A1C Humphries.

Subsequently defense counsel moved to suppress the contents of the letter and A1C Humphries' testimony as evidence derived from it. On appeal, Appellant argues that

5

he had a reasonable expectation of privacy in his correspondence to A1C Humphries that was violated when SSGTs Payne and Schaaf viewed the outside of the envelope and saw both the return address and subsequently the internal contents described above.  As a result, any testimony regarding the contents of the letter as well as A1C Humphries' testimony should have been suppressed as fruit of an unlawful search.

    B.   <u>Discussion</u>

We review a military judge's decision to admit evidence for abuse of discretion.  If the military judge makes findings of fact, we review the findings under a clearly erroneous standard of review.  We review conclusions of law de novo.  <u>United States v. Alameda</u>, 57 M.J. 190, 198 (C.A.A.F. 2002).

The Fourth Amendment to the Constitution states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"  U.S. Const. amend. IV.  However, a Fourth Amendment violation occurs only when the government violates a reasonable expectation of privacy.  A reasonable expectation of privacy exists where a person "exhibit[s] an actual (subjective) expectation of privacy and, second, that expectation [is] one that society

6

is prepared to recognize as "'reasonable.'" Katz v. United States, 389 U.S. 347, 361 (1967)(Harlan, J., concurring). See United States v. Britton, 33 M.J. 238, 239 (C.M.A. 1991). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." Katz, at 351 (citations omitted).

The Supreme Court long ago recognized that sealed letters sent through the postal system are "papers" within the meaning of the Fourth Amendment. See Ex Parte Jackson, 96 U.S. 727, 733 (1877). Courts have also recognized that a reasonable expectation of privacy generally exists in the contents of sealed letters sent through the United States Postal Service. See United States v. Van Leeuwen, 397 U.S. 249, 251 (1970)(citing Jackson, 96 U.S. at 733)(noting that first class mail can only be "opened and examined" in accordance with the Fourth Amendment); United States v. Maxwell, 45 M.J. 406, 417 (C.A.A.F. 1996).[1] However, no reasonable expectation of privacy exists in the information visible on the outside of an envelope. "Letters and sealed

---

[1] The application of Department of Defense postal regulations was not argued, briefed, or discussed in this case, and we do not address their applicability.

packages are as fully guarded from examination and inspection, <u>except as to their outward form and weight</u>, as if they were retained by the parties forwarding them in their own domiciles." <u>Ex Parte Jackson</u>, 96 U.S. at 733 (emphasis added). The military judge recognized this distinction by dividing his analysis into two parts: (1) "the envelope itself and the writing on the envelope" and (2) "the contents of the sealed envelope." We consider the two issues in turn.

Application of the Fourth Amendment is necessarily fact intensive. A person may have an objectively reasonable expectation of privacy in one context, but not another, based on small variations in material fact or circumstance. Moreover, the analysis is multidimensional including consideration of the scope of the search, the location of the search, and the object searched. In this case, Appellant placed his outgoing letter with the trainees mail for subsequent delivery to be mailed at Lackland AFB. Appellant's name and address on the outside of the envelope prompted SSgt Payne to visually examine the envelope. The testimony indicates that certain words and a picture were visible to the naked eye through the outside of the envelope. There is no evidence in the record that

8

SSGT Payne or SSgt Schaaf used special means to look at the contents of the envelope.

Under Katz, the addressee and return address information on the outside of a sealed letter are not private because this information is knowingly exposed to the public.  Katz, 389 U.S. at 351.  Disclosure of this information is necessary for the delivery of mail and a reasonable person has no expectation that it will remain private.  See Smith v. Maryland, 442 U.S. 735, 742-44 (1979)(finding no reasonable expectation of privacy in phone numbers dialed since telephone users assume the risk that the phone company will reveal numbers called to the police); United States v. Hinton, 222 F.3d 664, 675-76 (9th Cir. 2000)(finding no reasonable expectation of privacy in address information on the outside of a mailed package or in a post office "parcel locker that cannot be individually rented, and from which the contents can be moved at employees' discretion"); United States v. Choate, 576 F.2d 165 (9th Cir. 1978)(finding no Fourth Amendment protection afforded to information that would foreseeably be available to postal employees); see also 1 Wayne R. LaFave, Search and Seizure A Treatise on the Fourth Amendment § 2.7 Surveillance of Relationships and Movements (3d. ed. 1996 &

Supp. 2002).[2]   Based on this precedent, the military judge correctly held that Appellant did not have a reasonable expectation of privacy in the address information on the outside of the letter.  Appellant left his letter for others to mail thus knowingly exposing the envelope to public view.

The contents of the letter raise a more difficult Fourth Amendment question.  Trainees and soldiers in the field often do not have direct access to a post office and often rely on others to transport their mail.  As a general rule, persons joining the armed forces do not forfeit the same reasonable expectation of privacy in the contents of their mail enjoyed by the other members of American society they serve and protect.  See Manual for Courts-Martial, United States (2002 ed.) [hereinafter MCM] Part IV, para. 93 (criminalizing unauthorized taking and opening of mail pursuant to Art. 134, UCMJ, 10 U.S.C. § 934 (2002)). However, this general rule is not blind to circumstances, just as the Fourth Amendment is not absolute in

---

[2] The Supreme Court has also held that there is no reasonable expectation of privacy in discarded trash left at the curb to be picked up.  See California v. Greenwood, 486 U.S. 35, 40 (1988).  While many people would be offended by the notion that someone is examining garbage left for collection or letters left for others to deliver to postal facilities, a reasonable person is aware of the potential risk and knows that what is plainly visible to anyone viewing the outside of an envelope, such as address information, is "knowingly expos[ed] to the public."  Katz v. United States, 389 U.S. 347, 351 (1967)(citations omitted).

application, but adjusts to that which society, as measured through our courts, is prepared to accept as objectively reasonable in the context presented.

Under the circumstances of this case, Appellant may have had a subjective expectation of privacy in the contents of his letter that were visible through the envelope, but such an expectation was not objectively reasonable. At trial Appellant likened the office desk at Camp Bullis to a mailbox and thus SSgt. Payne's actions to those of someone rummaging through the contents of a mailbox. We disagree. If Appellant had desired to afford his letter greater protection, he could have mailed the letter himself or used a thicker, more opaque envelope. By failing to do so, he took the risk that others would see the information that was visible through the envelope. The contents at issue here were seen with the naked eye by a person who was not unlawfully viewing the outside of the letters and had reason to consider the envelope further after seeing Appellant's name in light of the command policy on social contact with trainees. Therefore, we hold based on the facts of this case, that Appellant's expectation of privacy in the parts of his letter that were readily visible to the naked eye through the envelope was

not one that society would recognize as reasonable.[3]  Katz,
389 U.S. at 361.

Issue II:  Maltreatment

A.   Facts

MSgt Lebouef was the field supervisor and team chief
for Appellant at Camp Bullis.  In this capacity, MSgt
Lebouef was responsible for the training of approximately
100 airmen as well as the supervision of 17 instructors
assigned to the apprentice course.  As part of the training
regimen at Camp Bullis, MSgt Lebouef encouraged his primary
instructors assigned to each squad to conduct "just-in-
time" training.  This training consisted of ad hoc classes
conducted during downtime between formal periods of
instruction, such as during those times when recruits were
awaiting their turn on a range or at a training station.

Among the ad hoc classes MSgt Lebouef encouraged his
instructors to teach, was a class on Enemy Prisoner of War

---

[3] Appellant does not argue that his letter was seized in violation of
the Fourth Amendment.  Appellant's suppression motion and the
Government's response, indicates that after viewing the letter, Staff
Sergeant (SSgt) Schaaf instructed SSgt Payne to return the letter to
the pile and subsequently "took the issue of the letter up the chain of
command."  Based on the facts of this case, including Appellant's
voluntary decision to place his letter on the office table for someone
else to mail, SSgt Payne's  "inspection and detention" of the letter
did not amount to a seizure within the meaning of the Fourth Amendment.
Appellant did not have a sufficient possessory interest in the letter
at the time of SSgt Payne's "inspection;" nor was the detention of
sufficient duration to amount to a seizure.  See Maryland v. Macon, 472
U.S. 463, 469 (1985); United States v. Van Leeuwen, 397 U.S. 249, 253
(1970).

12

(EPW) searches.  As described by MSgt Lebouef, the EPW search is a fast, aggressive full-body search used to check a person for weapons and booby traps and to determine if an individual is dead or alive in combat conditions.  An EPW search is substantially more invasive than a protective police "frisk."  A proper EPW search involves sitting astride a body lying facedown, grabbing and squeezing skin and checking under clothing, rolling the body over, and performing the same search on the front of the body, including cavity searches between the legs and the bra area for females.

Given the nature of the EPW search, MSgt Lebouef "specifically told everybody on the team at least once or twice a quarter that males search males, females search females."  SSgt Valarie Ramirez, another instructor, testified that she always demonstrated the search on other females to avoid any appearance of sexual harassment, since anyone being searched in this way could feel "violated."  SSgt Schaaf testified that she learned the EPW search by watching demonstrations by MSgt Lebouef and that she and other instructors taught the search technique to trainees.  However, she stated that the Career Development Course taught that opposite sex searches were inappropriate and should not be performed except in emergency situations,

13

where no one of the same sex was available.  Finally, Ms. Jodie Slattum (formerly Airman Daniel), a former trainee who witnessed Appellant's search of A1C Emilee Delvalle, testified that Appellant himself told her at an earlier point in training that opposite sex searches should not be performed.

Appellant's maltreatment specifications arose out of his actions toward three trainees, A1C Delvalle, A1C Melanie Schira, and A1C Humphries, in the context of EPW training.  All three testified at trial.

1.  A1C Delvalle

A1C Delvalle testified that Appellant demonstrated the EPW search on her on two occasions.  In the first instance, Appellant had the squad form a "360," in this case a circle facing outward, and performed the search on her with her consent in front of two other female airmen, Airmen Daniel and Doe.  According to A1C Delvalle, Appellant was going to have one of the female airmen search her, but did so himself since Airman Daniel "didn't really know what to do."  In response to Appellant's request to search her, A1C Delvalle gave her permission, but also testified that "I felt that [yes] was the only answer I could say.  He was my instructor, and I felt that he knew what he was doing." She also testified that she had never seen the search

14

performed before and did not know what to expect when Appellant told her to lie down on the ground.

Appellant then demonstrated the EPW search on A1C Delvalle, including "pouncing" on her back, placing his boot between her legs under her pelvis, "brush[ing]" his hand, palm down across her body, including her breasts and vaginal area. Appellant explained his actions to the other trainees as he performed them.

The next day, Appellant again performed an EPW search on A1C Delvalle. This time, he did so when the trainees were practicing moving through "dense" bushes in a wedge formation (i.e., a "backward V"). Appellant and A1C Delvalle were at the rear of one of the wings of the wedge when Appellant ordered the trainees to drop to the ground in a prone position. Appellant then told her to take off her "LBE gear" and "play dead." He brought one of the female airman to the back of the "V," explaining that he was going to demonstrate the search again. The other trainees remained where they dropped, "spread out in the wedge formation."

During this second search Appellant did not ask A1C Delvalle's permission. Rather, when another female airman moved to perform the search, but had not yet touched A1C Delvalle, Appellant said, "I'm going to show you how to do

the search again."  He then searched her again, doing in A1C Delvalle's words "the same exact search, but it was more of a grab.  It wasn't so much of a brush this time."  This included "grabbing and squeezing" her breasts and groin.

2.  A1C Schira

A1C Schira testified that Appellant "searched" her on more than one occasion.  She stated that she could not remember whether Appellant asked for her consent before searching her and that she felt "violated."  However, A1C Robertin-Meridith, a fellow trainee, later testified that A1C Schira volunteered to be searched.

A1C Schira testified that she played the role of the "dead body," lying face down, and having the EPW search performed on her.  She stated that Appellant touched her back, legs, inner thigh, and buttocks and that he unbuttoned some of the top buttons of her shirt.  A1C Schira further testified that she felt "violated" while Appellant's hands were going over her body.  On cross-examination, A1C Schira testified that Appellant did not touch her breasts or vaginal area with his hands during the search.  She also stated that all the searches were performed in front of the whole squad.

16

3.  A1C Humphries

A1C Humphries also testified to two body searches performed on her by Appellant.  She was chosen by Appellant and told to "play dead on the ground" to demonstrate the "dead body" search.  Appellant did not ask for her consent and the search was performed with the rest of her squad "in a half circle observing."  A1C Humphries testified that Appellant did not remove any of her clothing, but went down the side of her body with his palms.  She stated that he also "grab[bed and] squeez[ed]" her breasts and buttocks.  He also made a "knife sweep" of her vaginal area and touched her there with his fingers.  A1C Humphries said that she felt "humiliated," "angry and shocked and confused" by Appellant's touching.  When asked why she did not say anything to him at the time, she responded that "[g]oing through training, basic and tech school, instructors just try to push upon you how high ranking an NCO is, how much more powerful and high ranking they are over an airman, so I didn't say anything."

Appellant also performed a second search of A1C Humphries that was "the same as the first."  Regarding this search, she stated, "I was more angry because I didn't know why I was being chosen."  She did not report the incident because she "didn't think . . . [she] would be believed."

Appellant was acquitted of the maltreatment specification involving A1C Schira, but convicted on the other two specifications.

B.    Discussion

Independent of his Fourth Amendment claim, Appellant argues that the evidence is legally insufficient to find him guilty of maltreatment based on his EPW searches of female trainees.  The test for legal sufficiency of evidence "is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt."  United States v. Turner, 25 M.J. 324, 325 (C.M.A. 1987)(citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  "Furthermore, we will draw every reasonable inference from the evidence of record in favor of the prosecution."  United States v. Davis, 56 M.J. 299, 300 (C.A.A.F. 2002).

The elements of maltreatment are:

(1)  That a certain person was subject to the orders of the accused; and
(2)  That the accused was cruel toward, or oppressed, or maltreated that person.

MCM Part IV, para. 17.b.

"[C]ruelty, oppression, or maltreatment, although not necessarily physical, must be measured by an objective

18

standard. . . . The imposition of necessary or proper duties and the exaction of their performance does not constitute this offense even though the duties are arduous or hazardous or both." Id. at para. 17.c.(2). There is no need to show actual harm, rather "[i]t is only necessary to show, as measured from an objective viewpoint in light of the totality of the circumstances, that the accused's action reasonably could have caused physical or mental harm or suffering." United States v. Carson, 57 M.J. 410, 415 (C.A.A.F. 2002).

Appellant contends that his body searches of female trainees were proper demonstrations of the EPW search technique, and that his acquittal on the specification involving A1C Schira, indicated that the members applied an improper subjective standard rather than Carson's objective standard. Although A1C Schira testified that she felt "violated," A1C Robertin, a fellow trainee, testified that A1C Schira volunteered to be searched. Appellant therefore claims that the members clearly used the wrong standard because they only convicted him of maltreatment against the two trainees subjectively upset by his conduct.

However, Appellant's acquittal as to A1C Schira does not prove that the members used an improper subjective standard, because other differences exist in the testimony

that might justify different results.  Most importantly,
A1C Schira testified on cross-examination that Appellant
did not touch her breasts or vaginal area with his hands
during the search.  In contrast, A1Cs Delvalle and
Humphries testified that Appellant's search included
"grabbing and squeezing" their breasts and touching their
vaginal areas.  A reasonable panel applying an objective
test could find that the searches of A1C Delvalle and A1C
Humphries rose to the level of maltreatment, while the
search of A1C Schira did not.  Moreover, testimony
indicated that the airmen in question were trainees subject
to Appellant's orders as their primary instructor.  Both
A1C Humphries and A1C Delvalle stated that Appellant's
grade as an NCO influenced the manner in which they reacted
to his touches.

Further, Appellant's claim that the searches were
"necessary or proper duties" for training and not
maltreatment is rebutted by the testimony of MSgt Lebouef,
SSgt Schaaf, SSgt Rodriguez, and Ms. Slattum.  The EPW
search is a legitimate subject of instruction, which
necessarily is demonstrated in an aggressive and violating
manner.  In a deployed context EPW searches might well be
performed as a matter of military necessity on persons of
the opposite sex.  But for the purposes of training at Camp

20

Bullis these four witnesses testified that same sex EPW searches were inappropriate or prohibited.

A reasonable panel could therefore find that Appellant's opposite sex EPW searches were not necessary or proper, as a training mechanism. Further, a reasonable factfinder could find that Appellant's intrusive body search of female trainees, objectively viewed, reasonably could have caused mental harm or suffering based on, among other testimony, that of SSgt Ramirez, who stated that a person subject to an EPW search could feel "violated," and that of A1C Humphries, who stated that she felt humiliated by the search.

## Decision

For these reasons, we affirm the findings and sentence of the Air Force Court of Criminal Appeals.